917 P.2d 370

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Orlando GANAL, Sr., Defendant–Appellant.**

No. 17327.

Supreme Court of Hawai'i.

May 8, 1996.

Keith S. Shigetomi of Shigetomi and Thompson, on the briefs, Honolulu, for defendant-appellant Orlando Ganal, Sr.

Caroline M. Mee, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee State of Hawai'i.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Defendant-appellant Orlando Ganal, Sr. appeals the judgment, guilty conviction, and sentence for: (1) the attempted first degree murder of (a) his estranged wife, Mabel Ganal (Mabel), (b) Michael Touchette (Michael), the brother of Mabel's lover, and (c) Michael's wife, Wendy Touchette (Wendy); (2) the first degree murder of (a) Ganal's mother- and father-in-law, Aradina and Santiago Dela Cruz (collectively, the Dela Cruzes), and (b) Michael and Wendy's infant children, Joshua and Kalah Touchette; (3) the use of a firearm in the commission of a felony; (4) the first degree terroristic threatening of Mabel's lover, David Touchette (David); and (5) the criminal property damage of the premises of his employer, Young Laundry.

On appeal, Ganal argues that: (1) the prosecution did not present sufficient evidence to establish probable cause that he committed first degree property damage at Young Laundry; (2) the trial court improperly denied his motion to suppress evidence found in his truck; (3) the trial court improperly denied his motion to dismiss the use of a firearm count; (4) he was deprived of a fair trial because of allegedly improper statements made by the prosecutor and/or his own outbursts in court; and (5) the trial court erroneously denied his motion to dismiss the attempted first degree murder count because attempt is an included offense under Hawai'i Revised Statutes (HRS) § 701–109 (1993).[1]

---

1. HRS § 701–109 provides in pertinent part:

 **Method of prosecution when conduct establishes an element of more than one offense.** (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:

 (a) One offense is included in the other, as defined in subsection (4) of this section; or

 (b) One offense consists only of a conspiracy or solicitation to commit the other; or

 (c) Inconsistent findings of fact are required to establish the commission of the offenses; or

 (d) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct; or

 (e) The offense is defined as a continuing course of conduct and the defendant's course of conduct was uninterrupted, unless the law

For the reasons discussed below, we reverse Ganal's conviction and sentence as to Counts II and III of the indictment and affirm Ganal's convictions and sentences on all other Counts.

## I. FACTUAL BACKGROUND

The many events that form the basis of the charges against Ganal in this case principally revolve around the night of August 25, 1991 and the early morning of August 26, 1991. We detail the relevant events largely in chronological order.

### A. Events Prior to August 25, 1991

Ganal testified at trial that, on February 15, 1991, he injured his back while working at his job at Young Laundry. Unable to work, and having difficulty obtaining workers' compensation, Ganal became despondent. At roughly the same time, Ganal's wife, Mabel, began having an affair with David, a co-worker at her part-time job. Ganal became suspicious of Mabel's affair, and through investigation, eventually confirmed his suspicions.

In early April 1991, as Mabel and Ganal's marriage began to deteriorate, Ganal began calling David—at times, he was friendly; at others, he threatened David and his family with violence. At approximately the same time, Mabel left Ganal to live with her parents, the Dela Cruzes. Orlando Ganal, Jr. ("Jun Jun"), Ganal and Mabel's son, then age thirteen, continued to live with Ganal.

Mabel testified at trial that on Saturday, August 24, 1991, she was at Ganal's home to pick up Jun Jun when she and Ganal began to quarrel. The quarrel escalated, culminating in Ganal pointing a gun at Mabel and begging her to move back in with him. When Mabel refused, Ganal pointed the gun at his own head as if to shoot himself. Mabel eventually convinced Ganal not to shoot himself and persuaded Ganal to give her the gun. Mabel then called for Jun Jun to help her, but Ganal stopped her and threatened to kill both Mabel and Jun Jun. When Jun Jun came to Mabel's aid, Mabel signaled to Jun Jun that Ganal had a gun, and Jun Jun left the house. Ganal and Mabel continued to quarrel, and, after they stopped arguing, they looked for Jun Jun, but they could not find him. A neighbor took Mabel back to the Dela Cruzes' home in Waipahu, and, during that night and the following day, Mabel called Ganal periodically to see if Jun Jun had returned home, but she learned that he had not.

### B. The Night of August 25, 1991

#### 1. The Dela Cruz House in Waipahu

At approximately 7:00 p.m., on August 25, 1991, Jun Jun's girlfriend dropped Jun Jun off at the Dela Cruz house. Mabel told Jun Jun that she wanted him to go to his father, but when Jun Jun called to ask Ganal to pick him up, Jun Jun and Ganal began to argue. Mabel then called Ganal to apologize for Jun Jun, but Ganal swore at her, accusing her of turning Jun Jun against him. Mabel, Jun Jun, and the Dela Cruzes then ate dinner, watched television, and went to sleep.

Mabel testified at trial that, on the night of August 25, 1991, she was sleeping on a couch at her parents' house when she awoke to the sound of the front door being forced open. Mabel then looked up, saw a silver-colored gun, and was shot along the side of her head. She managed to crawl to her brother's room and then to her father's room, but the doors to both rooms were locked. Meanwhile, the intruder was kicking and punching her, but she was unable to see who it was. Mabel's father awoke, came out of his room, and tried

provides that specific periods of conduct constitute separate offenses.

. . . .

(4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:

(a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

(b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or

(c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

to stop the intruder, but the intruder shot him.

Jun Jun testified at trial that he was sleeping on the floor next to the television in the Dela Cruzes' living room when he awoke to the sound of his mother yelling his name. He opened his eyes and saw Ganal in the light from the balcony. Ganal then shot Jun Jun in the mouth. Jun Jun managed to elude Ganal and ran downstairs to a neighbor's home. Jun Jun noted that Ganal was wearing blue jeans.

Mabel's brother, Diegó Dela Cruz (Diego), testified that he was asleep in his room when he was awakened by the sound of gunshots and heard Mabel screaming in the living room. Fearing for his family's safety, Diego immediately knocked out his bedroom jalousies and helped his wife and child climb outside. As they crouched outside, Diego heard pounding on his bedroom door and then the sound of his father moaning in the hallway. When he climbed back inside, Diego found his mother bent over a sofa, dead, and his father sliding down the stairway, covered with blood and moaning. Aradina Dela Cruz died as a result of seven gunshot wounds. Santiago Dela Cruz died as a result of multiple internal injuries caused by three gunshot wounds.

Rosemary Nishimura, who lived just north of the Dela Cruz house, testified that, at approximately 11:00 p.m., she heard a loud noise, like a pipe falling on cement, followed by six shots. She looked out toward the Dela Cruz house and saw a man in dark clothing, who appeared to be reloading a gun. Ven Malapit, another of the Dela Cruzes' neighbors, heard the noises and gunshots, looked out his garage window, and saw a man, possibly Filipino, holding a gun and dressed in dark clothes, run towards a dark-colored Chevrolet truck with a lighter-colored tailgate and drive away.

### 2. The Touchette House in Kailua

Barbara Fitzpatrick, a neighbor of the Touchettes, testified at trial that, on the night of August 25, 1991, she heard the sound of glass breaking, followed by a small explosion. She looked out to see a Filipino or local man, wearing a dark jacket and jeans, carrying an object and walking very fast toward a dark gray or blue truck. The man put the object in the truck bed, got into the truck, and drove away quickly. Fitzpatrick then noticed a fire in the Touchettes' house. Neighbors Gary Guillermo and Clayt Kobashigawa corroborated Fitzpatrick's testimony.

Wendy Touchette testified that on the same night, she, her husband, and their two children were getting ready for bed when they received a phone call. Michael answered the phone and said "hello" a few times, but no one responded. Michael, Wendy, and the two children were all sleeping in the main bedroom when Wendy awoke to the sound of Michael screaming. She got up and saw Michael on fire. Michael was saying, "He was here, he's here, he was here." Wendy said, "What?" and Michael said, "Orlando," and "Get out." Soon thereafter, Wendy was also on fire, and she tried unsuccessfully to get to the bathroom for some water, but the fire was too hot.

Michael and Wendy struggled to get out of the house, but could not open the front door because it was somehow locked from the outside. Wendy eventually managed to reach the kitchen door, where someone pulled her out. The Touchette children, Joshua and Kalah, died of thermal burns and smoke inhalation at the scene. Michael died later, on September 23, 1991, as a result of complications related to severe burns over eighty percent of his body. Wendy was severely burned over approximately forty percent of her body and suffered scarring over much of her face.

Fire investigator Glen Solem testified at trial that the fire at the Touchette house was intentionally started with a liquid accelerant, probably gasoline. Solem further testified that, based on the burn patterns and the patterns of broken glass on the floors, it appeared that two fires had been started separately in the living room and the bedroom from gasoline being thrown into the house.

### 3. The Young Laundry Premises

Young Laundry's night watchman, Suesue Faamamalu, testified at trial that he was on

his patrol of the Young Laundry premises at approximately 12:00 midnight on August 25, 1991, when he discovered a fire burning on the second floor of the building. Young Laundry's manager, Michael Drace, testified at the grand jury proceedings that the Young Laundry plant operates twenty-four hours a day and that there are people working in the plant at all hours. Drace further testified that the sprinkler system extinguished the fire. Fire Investigator Warner Pukini testified at trial that his investigation indicated that the fire was intentionally set with a combustible liquid. The burn patterns suggested that the combustible liquid was poured towards the back exit, where they found a gas can that they suspected contained the accelerant. Ganal, Mabel, Jun Jun, and Ganal's tenant, Charles Robinson, all identified the gas can found at the Young Laundry premises as being similar to one that Ganal kept in his tool shed at home. After Ganal's arrest, a police search of Ganal's home, garage, and tool shed produced no gas can.

## C. *Events After August 25, 1991*

Ganal testified that, after his phone conversation with Mabel, during the evening of August 25, 1991, he blacked out. The next thing he remembered was waking up the next morning perspiring in his truck at a beach in Makaha. He took off his clothes and his watch, left the key in the ignition, and went into the water dressed only in his underwear. Ganal further testified that, while he was in the water, someone stole his clothes, and, when he attempted to give chase, he cut his heel on a sharp object in the water. Unable to pursue the thieves, he drove home.

As Ganal drove home, the police were already aware of the events that had transpired at the Dela Cruz house, the Touchette house, and the Young Laundry premises. While on patrol, Honolulu police officers Robert Burns and George Clark recognized Ganal's license plate number and followed him. Once Ganal arrived at his home, he began to exit his truck to open the gate to his driveway, at which point officers Burns and Clark shouted to Ganal to stop and put his

hands up. The officers testified that, upon approaching Ganal with their guns drawn, they could not see Ganal's left hand, because he kept it in the truck at all times. Fearing for their safety, the officers instructed Ganal to lie face down on the ground, but Ganal would not comply. Burns and Clark moved in closer and grabbed Ganal's left hand; Ganal resisted by yelling, kicking, and swinging his arms, refusing to be placed in a prone position on the ground. The officers swept Ganal's feet out from under him, placed him in handcuffs, and informed him that he was under arrest for murder. During the scuffle, Ganal suffered bruises on his face, arms, and rib area as well as a broken nose. Both Officers Burns and Clark denied hitting Ganal or seeing anyone else hit him.

At approximately 6:40 a.m., Detective Vernon Santos arrived at the scene of the arrest. By that time, Ganal had been moved to a blue-and-white police vehicle. Detective Santos informed Ganal that he was investigating a murder and that a shooting had occurred at Ganal's mother-in-law's house; he sought to obtain Ganal's cooperation in filling out an Honolulu Police Department (HPD) Consent to Search form (Form 393 or consent form) for Ganal's truck. Detective Santos testified that Ganal appeared calm and that Ganal indicated he could read, write, and understand English. Detective Santos read through the Form 393 to inform Ganal of his rights and asked Ganal for his consent to search his truck. Ganal indicated that he understood his rights, read the form for some time, appeared to understand it, and signed it. The search of Ganal's truck revealed one spent shell, which subsequently was determined to match shells recovered at the Dela Cruz and Touchette houses.

Ganal, on the other hand, testified that, when he arrived home and the police told him to put his hands up and get on the ground, he complied. After the police handcuffed his hands behind his back, they started kicking him on his ribs, thighs, elbows, and arms, and threatened to "break [his] face." Ganal also claimed that Officer Burns pounded his head into the ground. Ganal further testified that he signed the consent form because Detective Santos told him that,

if he did not sign the form, "they going make it hard for me." Ganal asserted that he did not realize that Detective Santos was asking for his permission to search the truck and that he thought that, by saying "make it hard," Detective Santos meant that the officers would "beat him up again" if he did not cooperate. Ganal admitted that Detective Santos allowed him to read the consent form but he denied that Detective Santos read the form to him.

On August 30, 1991, twelve-year-old Justin Daite was snorkeling in Mokuleia when he saw and retrieved a gun and sledgehammer lying on the ocean bottom in approximately three to five feet of water and turned the articles over to the police. The police searched the shrubs in the surrounding area and found a pair of white Reebok shoes, grey socks, a black vinyl jacket with an empty bottle in the pocket, a pair of jeans, a maroon belt, and another empty brown bottle. In the jeans' pockets, the officers found a BMW key ring, some loose change, and a letter from the Hawai'i State Department of Education addressed to the parents of Orlando Ganal, Jr. Written on the back of the envelope of the letter was Jun Jun's girlfriend's address. Jun Jun's girlfriend testified that she had given Ganal the address over the telephone on August 24, 1991.

Mabel identified the BMW key ring retrieved from Mokuleia as belonging to her and the shoes and belt found at Mokuleia as belonging to Ganal. Jun Jun also identified the black jacket recovered from Mokuleia as

2. HRS § 707–701 (1993) provides in pertinent part:

> **Murder in the first degree.** (1) A person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of:
> (a) More than one person in the same or separate incident[.]
> ....
> (2) Murder in the first degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

3. HRS § 706–656(1) (1993) provides:

> **Terms of imprisonment for first and second degree murder and attempted first and second degree murder.** (1) Persons convicted of first degree murder or first degree attempted murder shall be sentenced to life imprisonment without possibility of parole.

Ganal's. HPD Detective Charles Davis testified that marks on the door panel to the Dela Cruz house, which had been forcibly broken into on the night of the homicides, were consistent with the use of a sledgehammer like the one found at Mokuleia. The gun found at Mokuleia also matched four empty shell casings and a bullet recovered from the Dela Cruz house, an empty shell casing recovered from the road in front of the Touchette home, and the empty shell casing found in Ganal's truck.

## II. PROCEDURAL BACKGROUND

On August 29, 1991, the grand jury returned a five-count indictment against Ganal, which provided:

The Grand Jury charges:

*COUNT I:* On or about the 25th day of August, 1991, in the City and County of Honolulu, State of Hawaii, ORLANDO GANAL, SR., did intentionally or knowingly cause the death of more than one person in the same or separate incident, thereby committing the offense of Murder in the First Degree, in violation of Sections 707–701(1)(a)[2] and 706–656[3] of the Hawaii Revised Statutes.

*COUNT II:* On or about the 25th day of August, 1991, in the City and County of Honolulu, State of Hawaii, ORLANDO GANAL, SR., did intentionally commit an act which constituted a substantial step in a course of conduct intended or known to cause the death of more than one person [4]

> As part of such sentence the court shall order the director of the department of public safety and the Hawai'i paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

4. On October 15, 1991, Ganal filed a Motion for a Bill of Particulars for the alleged decedents in Count I and the complaining witnesses in Count II. The motion was granted, and the prosecution filed an Amended Response to Defendant's Motion for Bill of Particulars, setting forth the decedents in Count I as being Santiago Dela Cruz, Aradina Dela Cruz, Kalah Touchette, and Joshua Touchette, and setting forth the complaining wit-

in the same or separate incident, thereby committing the offense of Attempted Murder in the First Degree, in violation of Sections 705–500 [5], 707–701(1)(a) and 706–656 of the Hawaii Revised Statutes.

*COUNT III:* On or about the 24th day of August, 1991, in the City and County of Honolulu, State of Hawaii, ORLANDO GANAL, SR., did knowingly possess or intentionally use or threaten to use a firearm while engaged in the commission of a felony, whether the firearm was loaded or not, and whether operable or not, thereby committing the offense of Possession, Use or Threat to Use a Firearm in the Commission of a Felony, in violation of Section 134–6(a) and (d) [6] of the Hawaii Revised Statutes.

*COUNT IV:* On or about the 1st day of May, 1991, to and including the 10th day of July, 1991, in the City and County of Honolulu, State of Hawaii, ORLANDO GANAL, SR., threatened, by word or conduct to cause bodily injury to David Touchette,

by threatening David Touchette on more than one occasion for the same or similar purpose, in reckless disregard of the risk of terrorizing said David Touchette, thereby committing the offense of Terroristic Threatening in the First Degree, in violation of Section 707–716(1)(a) [7] of the Hawaii Revised Statutes.

*COUNT V:* On or about the 26th day of August, 1991, in the City and County of Honolulu, State of Hawaii, ORLANDO GANAL, SR., did intentionally damage property, and thereby recklessly placed another person in danger of death or bodily injury, thereby committing the offense of Criminal Property Damage in the First Degree, in violation of Section 708–820 [8] of the Hawaii Revised Statutes.

On January 15, 1992, Ganal filed a motion for a bill of particulars for, among other things, the felony which formed the basis of the use of a firearm charge in Count III. The motion was granted, and the prosecution responded by alleging that the felony in-

nesses in Count II as being Mabel Ganal, Michael Touchette, and Wendy Touchette.

5. HRS § 705–500 (1993) provides in pertinent part:

> **Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:
> (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
> (b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
> (2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.
> (3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

6. HRS § 134–6 (Supp.1992) provides in pertinent part:

> **Possession or use of firearm in the commission of a felony; place to keep firearms; loaded firearms; penalty.** (a) It shall be unlawful for a person to knowingly possess or intention-

ally use or threaten to use of firearm while engaged in the commission of a felony, whether the firearm was loaded or not, and whether operable or not.
> . . . .
> (d) Any person violating this section by possessing, using or threatening to use a firearm while engaged in the commission of a felony shall be guilty of a class A felony. Any person violating this section by carrying or possessing a loaded firearm or by carrying or possessing a loaded or unloaded pistol or revolver without a license issued as provided in section 134–9 shall be guilty of a class B felony. Any person violating this section by carrying or possessing an unloaded firearm, other than a pistol or a revolver, shall be guilty of a class C felony.

7. HRS § 707–716 (1993) provides in pertinent part:

> **Terroristic threatening in the first degree.** (1) A person commits the offense of terroristic threatening in the first degree if the person commits terroristic threatening:
> . . . .
> (d) With the use of a dangerous instrument.

8. HRS § 708–820 (1993) provides:

> **Criminal property damage in the first degree.** (1) A person commits the offense of criminal property damage in the first degree if the person intentionally damages property and thereby recklessly places another person in danger of death or bodily injury.

volved was Terroristic Threatening in the First Degree.

On February 7, 1992, Ganal filed a Motion to Dismiss Count V for Insufficient Evidence and a Motion to Suppress Evidence secured from his truck. Both motions were denied. On February 19, 1992, Ganal filed a motion to dismiss Count II for violation of HRS § 701–109,[9] which was also denied.

Trial began on March 1, 1993, and the jury returned a verdict of guilty of all counts on April 7, 1993. On April 23, 1993, Ganal filed another motion to dismiss Count II for a violation of HRS § 701–109, arguing that Counts I and II merged for purposes of sentencing. Ganal was granted leave to orally modify the motion to include double jeopardy at the hearing on the motion, and the motion was denied. Judgment was entered on July 1, 1993, and this timely appeal followed.

### III. *DISCUSSION*

A. *Sufficiency of the Evidence to Establish Probable Cause before the Grand Jury on the First Degree Property Damage Count.*

■ Ganal first argues that the trial court erroneously denied his motion to dismiss Count V (criminal property damage) [10] of the indictment because the prosecution failed to present sufficient evidence before the grand jury to establish probable cause to indict him on that charge.

■ "A grand jury indictment must be based on probable cause." *State v. Chung,* 75 Haw. 398, 409, 862 P.2d 1063, 1070 (1993) (quoting *State v. Okumura,* 59 Haw. 549, 550, 584 P.2d 117, 119 (1978)); *see also State v. Scotland,* 58 Haw. 474, 476, 572 P.2d 497, 498 (1977) (Sufficient legal and competent evi-

dence before a grand jury which establishes probable cause that a suspect has violated the law will support an indictment.). "Probable cause means such a state of facts as would lead a person of ordinary caution or prudence to believe and conscientiously entertain a strong suspicion of [the] guilt of the accused." *Chung,* 75 Haw. at 409–10, 862 P.2d at 1070 (quoting *Okumura,* 59 Haw. at 551, 584 P.2d at 119); *cf. State v. Kuba,* 68 Haw. 184, 191, 706 P.2d 1305, 1310 (1985) ("Probable cause has been established when it can be said that a reasonable and prudent person viewing the evidence would have a strong suspicion that a crime has been committed"). In reviewing the sufficiency of the evidence to establish probable cause before the grand jury, "every legitimate inference that may be drawn from the evidence must be drawn in favor of the indictment and neither the trial court nor the appellate court on review may substitute its judgment as to the weight of the evidence for [that of] the Grand Jury." *Kuba,* 68 Haw. at 191, 706 P.2d at 1310–11. The evidence to support an indictment need not be sufficient to support a conviction. *Id.* (quoting *State v. Freedle,* 1 Haw.App. 396, 399, 620 P.2d 740, 743 (1980).

■ Ganal's sole argument regarding Count V is that the evidence presented before the grand jury was insufficient to establish that it was Ganal who started the fire at Young Laundry, with which we disagree. Taken in its totality, the evidence before the grand jury in this case was sufficient to elicit a strong suspicion and to support inferences that Ganal started the fire at Young Laundry. First, HPD Detective Clifford Rubio testified that he learned from David Touchette that Ganal had told Touchette that Ganal "wanted to burn Young Laundry down because they did not pay him for his back injury." [11]

---

**9.** *See supra* note 1.

**10.** Under HRS § 708–820(1), "[a] person commits the offense of criminal property damage in the first degree if the person intentionally damages property and thereby recklessly places another person in danger of death or bodily injury."

**11.** We note that the hearsay exception applicable to evidence presented before the Grand Jury is

broader than the exception contained in the Hawai'i Rules of Evidence. *See State v. Murphy,* 59 Haw. 1, 5–6, 575 P.2d 448, 452–53 (1978); *State v. Layton,* 53 Haw. 513, 515, 497 P.2d 559, 561 (1972) ("Hearsay evidence should only be used [in a grand jury proceeding] when direct testimony is unavailable or when it is demonstrably inconvenient to summon witnesses able to testify to facts from personal knowledge." (quoting *United States v. Umans,* 368 F.2d 725, 730 (2d Cir.1966)). The transcript of the Grand Jury

Second, the circuit court also looked to the totality of the circumstances in denying Ganal's motion to dismiss the property damage count, namely: (1) the temporal proximity of all of the events of August 25, 1991—the shooting at the Dela Cruzes' residence at 11:00 p.m., the burning of the Touchette home at 11:30 to 11:45 p.m., and the Young Laundry fire at 12:00 midnight; (2) the fact that Ganal apparently possessed the means to commit the offense, in that an accelerant was used to start the Young Laundry fire, and an accelerant was used at the Touchette residence;[12] and (3) the fact that Ganal threatened to harm the Touchettes and acted upon those threats.

We therefore hold that sufficient evidence was presented before the grand jury to support count V of the indictment.

B. *The Validity of Ganal's Consent to Search His Truck.*

 Ganal next argues that the circuit court erroneously denied his motion to suppress the evidence acquired by a search of his truck on the basis that he did not validly consent. We have repeatedly recognized that, if anything is settled in the law of search and seizure, it is that a search without a warrant issued upon probable cause is unreasonable per se. *State v. Meyer,* 78 Hawai'i 308, 312, 893 P.2d 159, 163 (1995) (citations and internal quotation marks omitted). However, we have also recognized that the warrant requirement is subject to a few specifically established and well-delineated exceptions. *Id.* One of the specific exceptions is a search conducted pursuant to consent. *State v. Texeira,* 50 Haw. 138, 140, 433 P.2d 593, 596 (1967). It is well settled that consent to a warrantless search must be "voluntary" to be valid. *State v. Price,* 55 Haw. 442, 443, 521 P.2d 376, 377 (1974). "Whether consent to a search was freely and voluntarily given, as in a case where custodi-

al interrogation may be implicated, must be determined from the totality of circumstances surrounding the defendant's purported relinquishment of a right to be free of unreasonable searches and seizures." *State v. Russo,* 67 Haw. 126, 137, 681 P.2d 553, 562 (1984) (quoting *State v. Merjil,* 65 Haw. 601, 605, 655 P.2d 864, 868 (1982)). It is the government's burden to demonstrate that consent was freely and voluntarily given, *Merjil,* 65 Haw. at 605, 655 P.2d at 868 (1982), and the burden is "particularly heavy in cases where the individual is under arrest." *Russo,* 67 Haw. at 137, 681 P.2d at 562 (quoting *Judd v. United States,* 190 F.2d 649, 651 (D.C.Cir.1951)). The fourth and fourteenth amendments to the United States Constitution require that a consent not be coerced by explicit or implicit means, by implied threat, or by covert force. *State v. Patterson,* 58 Haw. 462, 467–68, 571 P.2d 745, 749 (1977) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 228, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973)); *see also State v. Fields,* 67 Haw. 268, 282, 686 P.2d 1379, 1390 (1984) ("Where there is coercion there cannot be consent." (quoting *Bumper v. North Carolina,* 391 U.S. 543, 550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968)).

 On appellate review, the findings of a trier of fact regarding the validity of a consent to search must be upheld unless clearly erroneous. *Patterson,* 58 Haw. at 468, 571 P.2d at 749. "[A] finding of fact is clearly erroneous when[,] although there is evidence to support it, the reviewing court, on the entire evidence[,] is left with the definite and firm conviction that a mistake has been committed." *Kim v. State,* 62 Haw. 483, 493, 616 P.2d 1376, 1382 (1980) (citations and internal quotation marks omitted); *see also State v. McGriff,* 76 Hawai'i 148, 157, 871 P.2d 782, 791 (1994).

---

proceedings indicates that David Touchette was unavailable to testify before the Grand Jury due to financial hardship and inconvenience as he had relocated to the mainland after the incident.

12. Witness Barbara Fitzgerald (formerly Barbara Broome) testified that she saw an individual carrying an item near the Touchette residence that could be considered a container for the acceler-

ant. Ven Malapit, a neighbor of the Dela Cruz family in Waipahu, and Clayt Kobashigawa, a neighbor of the Touchettes in Kailua, both described an older model, dark colored truck, appearing to be a Chevrolet, at their respective locations similar to the blue Chevrolet truck owned by Ganal.

 Ganal contends that his consent to search his truck was invalid because he was beaten by the arresting police officers prior to giving consent. Ganal argues that: (1) he was beaten by police at the time of his arrest; (2) the trial court did not find that he was not beaten by police; and (3) he was still operating under the influence of the beating when he executed the consent form at the scene of his arrest.

 A waiver, even though uncoerced and intelligently given, will be invalid if induced by a prior illegality. *State v. Pau'u*, 72 Haw. 505, 509–10, 824 P.2d 833, 835–36 (1992); *State v. Knight*, 63 Haw. 90, 94, 621 P.2d 370, 374 (1980). When the defendant makes a showing that waiver was predicated upon an illegal search, the government's burden in rebutting the invalidity of the waiver is to show that the waiver "has [not] been come at by exploitation of that illegality [but] instead by means sufficiently distinguishable to be purged of the primary taint." *Pau'u*, 75 Haw. at 510, 824 P.2d at 836 (quoting *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963) (quoting Maguire, *Evidence of Guilt* 221 (1959))).

At the hearing on the motion to suppress, Ganal relied on his testimony relating his version of the events surrounding his arrest and the subsequent procurement of his consent, as well as some photos taken of him four days after the arrest, showing injuries that he allegedly received during the arrest. The prosecution relied on Ganal's signature on the consent form and the testimony of officers Burns and Clark. The prosecution also relied on Ganal's admission on cross-examination that he was given the Form 393 and could have read it if he so chose. The circuit court resolved the factual issue of coercion in favor of the prosecution. In the order denying Ganal's motion to suppress, the circuit court noted:

2. With regard to the matter of whether or not there was free and voluntary consent to search Defendant's truck, the Court makes the following findings of fact:

a. None of the officers who allegedly were involved in any physical contact or beating of Defendant were the same officers who attempted to obtain his consent to search the truck.

b. The Court further notes that at the time that Detective Vernon Santos arrived at the scene, it was Detective Santos' unrebutted testimony that:

1) Defendant was already in the blue and white police vehicle;

2) That there were no police officers next to Defendant, or asserting their physical force or authority over Defendant;

3) That Defendant had been pretty much left alone; and

4) That some time had passed during which Defendant had an opportunity to be free of any police contact or misconduct.

c. Even if one were to believe that the police, at any time, physically assaulted Defendant, there was no evidence that Detective Santos, upon his arrival at the scene, was aware, or took advantage of, that information so as to exert that improper influence over Defendant's consent to search his truck.

3. Taking the testimony of Detective Santos versus Defendant's testimony, the Court finds that [sic] Detective Santos' testimony to be more credible.

4. The Court further notes that with regard to the matter of consent, it appears that the critical difference between this case and *State v. Russo*, 67 Haw. 126, 681 P.2d 553 (1984),[13] is whether or not a written consent form was used:

___

13. In *Russo*, police officers attempted to secure a post-arrest written consent from Russo, to which Russo replied, "I gave you verbal consent and I won't sign any papers." *Id.* at 138, 681 P.2d at 562. The court held that "[w]hile assent could be inferred from these words, the context in which they were uttered leads us to believe they did not represent an essentially free and unre-

strained choice. Furthermore, though knowledge of a right to refuse is [not] an indispensable element of a valid consent, that a person was not so advised is nevertheless a factor to be considered in evaluating the totality of circumstances as they bear upon the question of whether such consent was freely and voluntarily given." *Id.* (citation and internal quotation marks omitted;

a. In the instant case, the Honolulu Police Department's form HPD–393, the written consent to search form, is relevant with regard to the totality of circumstances because once consent was given, certain rights contained in the consent form, including the right to counsel and the right to refuse, were deemed waived.

b. The Court finds that when Detective Santos reviewed the HPD–393 form with Defendant, Defendant was provided with an opportunity to read through the form.

5. Having had the opportunity to listen to Defendant's testimony, the Court finds that Defendant is intelligent, understands the English language, and that he admitted that he can read and write.

6. Therefore, the Court finds that regardless of what may have preceded the arrival of Detective Santos and what may have preceded the questioning by Detective Santos on the matter of consent, that when consent was given to Detective Santos, the consent was freely and voluntarily given.

 The issue of voluntariness is thus reduced to the factual issue of coercion, which, in turn, rests on a determination of credibility made by the circuit court. As the *Patterson* court noted:

The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal[,] all presumptions favor proper exercise of that power, and the trial court's findings whether express or implied must be upheld if supported by substantial evidence.

58 Haw. at 468, 571 P.2d at 749 (quoting *People v. James*, 19 Cal.3d 99, 107, 561 P.2d 1135, 1139, 137 Cal.Rptr. 447, 451 (1977)); *see also Domingo v. State*, 76 Hawai'i 237, 242, 873 P.2d 775, 780 (1994) ("[A]n appellate court will not pass upon issues dependent upon the credibility of witnesses and the

weight of the evidence; this is the province of the trial judge." (Citations omitted.)). Based on our review of the record, we hold that the trial court did not clearly err in finding that Ganal voluntarily consented to the search of his truck.

C. *The Circuit Court's Denial of Ganal's Motion to Dismiss Count III of the Indictment.*

 Ganal next argues that HRS § 134–6(a) (1993) "must be construed to prohibit prosecutions of cases involving felony terroristic threatening" and that, if the contrary construction were sustained, the prosecution thereunder violated his right to equal protection under both the United States and Hawai'i Constitutions. We first address the proper construction of HRS § 134–6(a).

The current version of HRS § 134–6(a) criminalizes possession, use or threatened use of a firearm and provides in pertinent part:

It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not[.]

HRS § 134–6(a) (Supp.1995). In addition, in the current version, a proviso specifically states that "a person shall not be prosecuted under this subsection where the separate felony is [t]he felony offense of terroristic threatening in the first degree under section ... 707–716(1)(d)[.]" HRS § 134–6(a)(3) (Supp.1994).

According to the bill of particulars filed by the prosecution in the instant case, the underlying felony for the HRS § 134–6(a) violation charged in Count III was terroristic threatening in the first degree against Mabel Ganal under HRS § 707–716(1)(d). Consequently, the prosecution of Count III would be invalid if the current version of HRS § 134–6(a) were applicable.

brackets in original); *see also United States v. Kim*, 803 F.Supp. 352 (D. Hawai'i 1992) (Defendant's signature on a United States Drug Enforcement Agency consent to search form was

not voluntary, where the suspect was naked, handcuffed, quite ill, and surrounded by four armed agents.).

However, when HRS § 134–6(a) was amended in 1993 to prohibit prosecution when the underlying felony is terroristic threatening in the first degree under HRS § 707–716(1)(d), the legislature expressly provided that the amendments were not to "affect rights and duties that matured, penalties that were incurred, and proceedings that were begun, before its effective date [of June 18, 1993]." *See* 1993 Haw.Sess.L.Act 239, § 2 at 240. The terroristic threatening against Mabel Ganal allegedly occurred on August 24, 1991. Therefore, it is clear that the current version of HRS § 134–6(a) does not apply.

On the other hand, this court has never interpreted the scope of the original version of HRS § 134–6(a).[14] For the reasons set forth below, we hold that the original version of HRS § 134–6(a) is inapplicable where the defendant's use of a firearm establishes an element of the underlying felony.[15]

■■■ When construing a statute, "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from language contained in the statute itself." *State v. Wells*, 78 Hawai'i 373, 376, 894 P.2d 70, 73 (citation and internal quotation marks omitted), *reconsideration denied*, 78 Hawai'i 373, 894 P.2d 70 (1995). The original version of HRS § 134–6(a) provides: "It shall be unlawful for a person to knowingly possess or intentionally use or threaten to use a firearm while engaged in the commission of a felony, whether the firearm was loaded or not, and whether operable or not." As explained in *State v. Israel*, 78 Hawai'i 66, 890 P.2d 303 (1995), "HRS § 134–6(a) requires the actual commission of an underlying felony," and "the State is required to prove all of the conduct, attendant circumstances, and results of conduct that comprise the underlying crime." 78 Hawai'i at 74–75, 890 P.2d at 311–12. Thus, the phrase "while engaged in the commission of a felony" contained in the

statutory definition incorporates all of the elements of whichever underlying felony was allegedly being committed. The statutory language requiring the person "to knowingly possess or intentionally use or threaten to use a firearm" may therefore be read to specify a separate and distinct element of the HRS § 134–6(a) offense.

On the other hand, the language of HRS § 134–6(a) could be read as allowing an overlap between the elements of the underlying felony and the use of a firearm expressly required therein. Therefore, we next consider the statute's legislative history. *See Wells*, 78 Hawai'i at 376, 894 P.2d at 73 ("[I]n determining the purpose of the statute, we are not limited to the words of the statute to discern the underlying policy which the legislature seeks to promulgate but may look to relevant legislative history." (Citation and internal quotation marks omitted.)).

Although the legislative committee reports leading up to the enactment of Act 195 in 1990 provide little guidance on this issue, examination of Act 195 suggests that HRS § 134–6(a) was not intended to apply where the defendant's use of a firearm establishes an element of the underlying felony. Under section 2 of Act 195 (codified as HRS § 134–6(a)), to "knowingly possess of intentionally use or threaten to use a firearm while engaged in the commission of a *felony*," 1990 Haw.Sess.L.Act 195, § 2 at 422 (emphasis added), is a Class A felony. At the same time, under section 3 of Act 195 (codified as HRS § 134–51(b)), to "knowingly possess[ ] or intentionally use[ ] or threaten[ ] to use a deadly or dangerous weapon while engaged in the commission of a *crime*," 1990 Haw. Sess.L.Act 195, § 3 at 422–23 (emphasis added), is a Class C felony.

■■■ Firearms are generally deadly or dangerous weapons within the meaning of HRS § 134–51(b). *See, e.g., State v. Kawazoye*, 63 Haw. 147, 148, 621 P.2d 384, 386

---

**14.** When referring to the original version of HRS § 134–6(a), we refer to the subsection as enacted in 1990. *See* 1993 Haw.Sess.L.Act 195, § 2 at 422.

**15.** The defendant's use of a firearm establishes an element of the underlying felony when (1) the

definition of the felony expressly includes the possession, use, or threat to use a weapon, and (2) that element is to be proven by the same possession, use, or threat to use a firearm as will be used to prove the possession, use, or threat to use a firearm element of HRS § 134–6(a).

(1981) ("a .22 calibre rifle is a deadly or dangerous weapon"); *State v. Jones,* 61 Haw. 135, 135, 597 P.2d 210, 210 (1979) ("[a] shotgun is a dangerous weapon per se"); *but see State v. Medeiros,* 4 Haw.App. 248, 255–58, 665 P.2d 181, 186–87 (1983) (although a flaregun is not per se a deadly or dangerous weapon, if it is used as a weapon, it is a firearm); *cf. State v. Schroeder,* 76 Hawai'i 517, 519 n. 1, 880 P.2d 192, 194 n. 1 (1994) (firearms are per se dangerous weapons within the meaning of HRS § 708–840). Therefore, if the use of a firearm is not read as a separate and distinct element, a person who "knowingly possesses or intentionally uses or threatens to use" a firearm in the commission of any crime, be it a felony, misdemeanor, or petty misdemeanor, *see* HRS § 701–107 (1993),[16] commits the Class C felony defined by HRS § 134–51(b). That person will in turn be violating HRS § 134–6(a) for using a firearm in the commission of that felony. In other words, the use of a firearm in the commission of any crime would invariably violate HRS § 134–6(a). If that is true, then the specific requirement of HRS § 134–6(a) that the firearm be used in the commission of a *felony* would become mere surplusage. We cannot interpret HRS § 134–6(a) in that manner. *See State v. Ortiz,* 74 Haw. 343, 351–52, 845 P.2d 547, 551–52 ("It is a cardinal rule of statutory construction that courts are bound to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute."), *reconsideration denied,* 74 Haw. 650, 849 P.2d 81 (1993).

Furthermore, subsequent legislative history demonstrates that the originally enacted version of HRS § 134–6(a) was never intended to apply where the defendant's use of a firearm establishes an element of the underlying felony. As explained in *State v. Bolosan,* 78 Hawai'i 86, 890 P.2d 673 (1995), "rele-

vant subsequent legislative history . . . can be used to determine the original legislative intent." 78 Hawai'i at 90, 890 P.2d at 677.

In 1992, a bill was introduced that would expressly make HRS § 134–6(a) inapplicable when the underlying felony involves the use of a firearm. Some of the statements from the legislative history are excerpted below:

The purpose of this bill is to clarify that section 134–6(a), Hawaii Revised Statutes, regarding the possession or use of a firearm in the commission of a felony, is limited to those offenses that are felonies without the use of firearm.

. . . .

According to the Public Defender and the Hawaii Association of Criminal Defense Lawyers, this bill will correct the overreaching effect of section 134–6, which allows the prosecutor to apply this section to offenses that already have enhanced penalties for the use of a firearm, such as terroristic threatening and reckless endangering, and to possessory gun offenses—a result not contemplated by the Legislature at the time of the provision's enactment in 1990 (Act 195).

. . . .

Consistent with the intent of this bill, your Committee made further clarifying amendments. . . .

Second, the proviso was amended to insure that section 134–6 does not apply to persons charged with offenses that, *by definition,* involve the possession, use or threatened use of a firearm and does not include terroristic threatening in the first degree.

Sen.Stand.Comm.Rep. No. 2207, in 1992 Senate Journal, at 1022 (emphasis in original); *see also* Hse.Stand.Comm.Rep. No. 1173–92, in 1992 House Journal, at 1344–45; Conf. Comm.Rep. No. 76, in 1992 Senate Journal, at 765–66.[17]

---

16. HRS § 701–107(1) provides in pertinent part: "An offense defined by this Code or by any statute of this State for which a sentence of imprisonment is authorized constitutes a crime. Crimes are of three grades: felonies, misdemeanors, and petty misdemeanors."

17. Similar statements are found in the legislative history accompanying the similar 1993 bill that was enacted after then-Governor Waihee vetoed the 1992 bill. For instance, the conference committee report on the 1993 bill stated:

The purpose of this bill is to amend section 134–6, Hawaii Revised Statutes (HRS), to clar-

Although the governor vetoed the 1992 bill, that fact alone does not render the legislative committee reports meaningless; the reports are nevertheless indicative of the original legislative intent. Moreover, the governor's statement of objections included the following explanation of the original legislative intent:

The amendments proposed by this bill are intended to address an unforeseen consequence of the amendments made to section 134–6 by Act 195, Session Laws of Hawaii 1990. Act 195 established a Class A felony for the possession, use, or threatened use of a firearm in the commission of a felony. Creation of this offense was intended to recognize and deter the heightened danger presented when firearm is involved in the commission of a felony such as burglary.

However, it was not intended to permit charging of a separate felony for use of a firearm where the underlying felony involves a firearm and is classified as a felony for that reason alone. Otherwise, the involvement of a single firearm would, in effect, be counted twice: once in the definition of the underlying felony and a second time in defining the separate felony.

Statement of Objections to Senate Bill No. 3145, in 1992 House Journal, at 746. A legislative committee report accompanying the 1993 bill, using virtually identical language, reiterated this understanding of the original intent of HRS § 134–6(a). Sen. Stand.Comm.Rep. No. 1217, in 1993 Senate Journal, at 1210.

■■■■ Finally, we note that, as a general rule, "[p]enal statutes are to be strictly construed." *Ortiz*, 74 Haw. at 352, 845 P.2d at 552. Accordingly, any ambiguity in the interpretation of HRS § 134–6(a) must be resolved in favor of Ganal.

ify that this section was not intended to apply to certain felonies, that already have enhanced penalties for identical conduct. Conf.Comm.Rep. No. 12, in 1993 House Journal, at 880. *See also* Hse.Stand.Comm.Rep. No. 472, in 1993 House Journal, at 1163.

Therefore, based on established rules of statutory construction, the language of HRS § 134–6(a), particularly when read together with the remainder of Act 195 and the subsequent legislative history, we hold that HRS § 134–6(a) does not apply where the defendant's use of a firearm establishes an element of the underlying felony.

In the instant case, the underlying felony alleged was terroristic threatening in the first degree against Mabel Ganal under HRS § 707–716(1)(d). One of the elements of HRS § 707–716(1)(d) is that the terroristic threatening at issue was committed "[w]ith the use of a dangerous instrument." The record reveals that the only dangerous instrument allegedly involved was a gun. Thus, it is evident that Ganal's use of a firearm established an element of the underlying felony. HRS § 134–6(a) is consequently inapplicable. Accordingly, we reverse Ganal's conviction under Count III of the indictment.[18]

D. *Motion for New Trial Based on Alleged Prosecutorial Misconduct and/or Ganal's Own Outburst[19] During Trial.*

1. **Alleged Prosecutorial Misconduct During Closing Arguments.**

■■■■ Ganal next argues that the trial court erred in denying his motion for new trial based on prosecutorial misconduct. The denial of a motion for new trial "is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion." *State v. Furutani*, 76 Hawai'i 172, 178–79, 873 P.2d 51, 57–58 (1994). "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *Id.* at 179, 873 P.2d at 58 (citations omitted). Misconduct of a prosecutor may provide grounds for a new trial if the prosecutor's actions denied the defendant a fair trial.

18. Because we conclude that Ganal's conviction under Count III must be reversed because HRS § 134–6(a) does not apply, we need not address Ganal's argument that the prosecution thereunder violated his right to equal protection.

19. See *infra* section III.D.2.

*State v. Agrabante*, 73 Haw. 179, 198, 830 P.2d 492, 502 (1992). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, [the reviewing court] consider[s] the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against the defendant." *Id.* (citing *State v. Senteno*, 69 Haw. 363, 366, 742 P.2d 369, 372 (1987)).

Ganal takes issue with fourteen portions of the prosecution's closing argument. Ganal contends that the prosecutor injected his personal opinion, was sarcastic, criticized the defense's argument, including Ganal's proffered mitigating defense of extreme emotional or mental disturbance for which there is a reasonable explanation, and tried to arouse sympathy for the decedents, thus prejudicing the jury against him. The portions of the prosecution's closing argument with which Ganal takes issue are as follows: [20]

[1.] Take Mabel Ganal, for example, and ask yourself if she was completely forthcoming when she took the oath and testified. And people will still criticize me and say, why didn't you cross examine her more vigorously, you know. Hey, that's me, I didn't think you need to cross examine Mabel—

[Ganal objected, and the objection was sustained.]

[2.] Gee, you know, you talk about Trimillos Ricardo [sic, Dr. Ricardo Trimillos, Ganal's expert on Filipino culture and values], I thought he was entertaining. Maybe some of you didn't think so, but what did he contribute about the [F]ilipino culture? He didn't do any real studies about amok.[21] He can tell you a lot of little tidbits about [F]ilipinos, basically, you know, he could certainly tell you the stereotypical perception of [F]ilipinos, kind of a racist guy, Ricardo.

[3.] For all we know he's [Ganal] maybe more socialized in American culture than Trimillos, you know. This thing about living in America and pursuing the American dream, I don't know what he did during that time that he was not working, but I just have—I don't know, he must have watched a lot of TV. I asked him that if [sic] he said no.

[4.] I don't know where he [Ganal] got the gasoline, he had two buckets, we don't have any evidence of that. I don't think he went half way and held back half of the bucket. He may have had another container, nobody knows that, but he threw the gasoline in the living room area.

[5.] You know his [Ganal's] performance here was just like a typical American soap, he had it down pat. I even asked him, Mr. Ganal, how's your back? The guy had the gall to say it still hurts me. My back still hurts. After all the innocent people he killed, he has the gall to come in here and say my back hurts.

How come his back wasn't hurting when he shot his mother-in-law six times? When he used the sledgehammer and smashed the windows at the Touchettes' and threw a bucket, five gallon bucket of gasoline on them, was his back hurting then?

He's in pain. He's suffering. He can't pay the bills. Does that give him the right just because his wife betrayed him, his son turned traitor on him and joined the other camp. Mike Drace[22] didn't want to pay him his Workers' Comp. He can't make the payments on the BMW he give [sic] to his wife. What gives him the right?

[Ganal objected, and the objection was sustained.]

Well, *what gives him the right* to come up here and tell you that he should be excused? That's what he is saying.

20. Unless otherwise noted, Ganal did not object to the specific remarks of the prosecutor cited here.

21. During trial, Ganal called Dr. Ricardo Trimillos, chair of the Asian Studies Program at the University of Hawai'i at Mānoa, to testify about Filipino culture and values. Among the topics Dr. Trimillos discussed was the concept of "amok" in Southeast Asia and the Philippines, a culturally-based condition of great emotional disturbance in individuals, under which a person loses control and goes about killing indiscriminately.

22. As previously indicated, Michael Drace is a manager at Young Laundry.

[6.] So there really is no basis. What they're [Ganal's experts] saying is, well, you guys [the jury] be the experts, you diagnose what he was suffering from. Here are the symptoms, pick the one you want. So if you want to give him a *break*, say that he was under extreme mental or emotional disturbance.

[7.] Anyway, ladies and gentlemen, the defendant, I urge you, was not under extreme mental or emotional disturbance because he was able to function so well that he couldn't have been no matter what he says. And based on that, I will ask you not to give him an *excuse* in this case. I'll ask you—

[Ganal objected to the prosecutor's use of the term "excuse," and the court overruled the objection noting that "to the terminology this is argument."]

Well, don't allow him any mitigation or extenuating circumstances, if you want to use the fancy word, to say that he should *not be held accountable* for what he did. Find him guilty as charged on all counts.

[8.] It's not a test of character. What is that, ladies and gentlemen? This is a test of your character? How long have I been doing this, ten years, 50 United States of America, every prosecutor has the same burden to prove the case beyond a reasonable doubt.

[9.] And you know that's our burden, we're not afraid of this burden. People are convicted every day on that burden of beyond a reasonable doubt.

So as I said the issue is, does he get the *benefit* of extreme emotional—extreme mental or emotional disturbance, that's the bottom line. Is that what the law is designed to do? I mean did you hear that argument?

[10.] Dr. Marsella [23] didn't say anything like that, because I told you, he's giving you the grab bag. If you want to feel sorry for this guy, give him a *break*. Does he deserve the benefit of extreme mental or emotional disturbance? I mean, you know, they want it both ways. They want the explosive thing.

[11.] You're not going to have Judge Milks [the presiding trial judge] hand you a big scale over here, okay, so that you can weigh the evidence and see where it tilts beyond a reasonable doubt, it's just a figurative [sic] of speech, right. You don't need no scale to weigh anything. If you had a scale the thing would—there's so much evidence that the State has put it, you know, it's not fair, it will tip the scale so far down it would break it. That's a ridiculous analogy. Reason and common sense is what you got to have to decide this case on.

[12.] It's so odd that he would be driving in his truck early in the morning only with his BVDs. What's so odd about that? It's the [F]ilipino bathing suit, that's nothing unusual. Huh? You want to talk about stereotypes? You know, why go in the water, you don't have to buy bathing suit, wear your BVDs, big deal. Probably get a lot of flack [sic] for that.

[13.] And, you know, I'm being sarcastic and cynical and all of that and maybe it's unfair because *he can't jump up and whack me* if he wanted to. But, you know, it's the big shibai [red herring or putting on an act], this whole story of amnesia, can't remember. *Stand up like a man* and say he did it, that's the—

[Ganal objected, and the objection was sustained.]

[14.] The only reason [Ganal said] I didn't put any bullets—well, he didn't say that—the only reason I didn't kill myself, he stopped himself when he thought about Jun Jun and wanted to see him grow up. Did he for a minute think Wendy and Michael wanted to see their two kids grow up? Did he think Aradina and Santiago wanted to see ... their grandchildren?

[Ganal objected and moved for a mistrial. The objection was sustained, the motion was denied, and the prosecutor was admonished. Out of the presence of the jury,

---

**23.** Dr. Anthony Marsella, professor of psychology at the University of Hawai'i at Mānoa, was qualified as an expert in cross-cultural and clinical psychology. Dr. Marsella testified at trial as to the effects of various life events on an individual's general stress level, as well as about the concept of "amok."

the prosecutor stated that he thought the comment was a fair one to make, and the court noted that "It is a fair comment, but it will draw an objection."]

(Emphases added.)

█ As a threshold matter, because Ganal did not object at trial to comments 2, 3, 4, 6, 8, 9, 10, 11, and 12 above, we must first determine whether the prosecutor's alleged misconduct in making those statements constituted plain error that affected Ganal's substantial rights. Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b);[24] *State v. Marsh,* 68 Haw. 659, 661, 728 P.2d 1301, 1302 (1986); *see also State v. Churchill,* 4 Haw. App. 276, 285, 664 P.2d 757, 763 (1983). The conduct complained of must affirmatively appear to be of such a nature that substantial rights of the accused were prejudicially affected. *Churchill,* 4 Haw.App. at 285, 664 P.2d at 764. If any such conduct, however, implicates a defendant's constitutional rights, "an appellate court must reverse a resulting conviction unless it can conscientiously conclude that 'in the setting of [the] particular case [the error is] so unimportant and insignificant that [it] may ... be deemed harmless.'" *State v. Pokini,* 55 Haw. 640, 645–46, 526 P.2d 94, 101 (1974) (brackets in original) (quoting *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967)).

In *Marsh,* a jury convicted Marsh of robbery in the second degree. The prosecution's case rested primarily on the testimony of the victim, Leroy Ing. Marsh denied committing the robbery and asserted an alibi defense. During summation, the prosecutor repeatedly stated her personal opinion: "Ladies and gentlemen, I feel it is very clear and I hope you are convinced, too, that the person who committed this crime was none other than Christina Marsh.... I'm sure she committed the crime." 68 Haw. at 660, 728 P.2d at 1302. "Referring to Marsh's testimony, the prosecutor stated: 'Use your common sense, ladies and gentlemen. That is not true. It's another lie. It's a lie, ladies and gentlemen, an out-and-out lie.'" *Id.* The prosecutor also expressed, on at least nine

occasions, her belief that defense witnesses had lied. *Id.*

First noting that the comments constituted plain error under HRPP Rule 52(b), this court held that the prejudicial impact of the remarks was not rendered harmless by the trial court's instructions to the jury and reversed the conviction. *Id.* at 661, 728 P.2d at 1302–03. The court did, however, couch its holding "[i]n light of the inconclusive evidence against Marsh, the particularly egregious conduct of the prosecutor in presenting her personal views on the dispositive issues, and the lack of a prompt jury instruction specifically directed to the prosecutor's closing remarks." *Id.*

Unlike the "inconclusive evidence" in *Marsh,* the evidence against Ganal was much stronger, and we examine the issue of plain error in the light of such strength in determining prejudice. Although we believe that the prosecutor's indecorous comments during closing argument in the present case were inappropriate, and, noting that the trial court did not give a curative instruction, we believe that the comments, taken in context, were not so egregious as those made in *Marsh* as to have deprived Ganal of his right to a fair trial, giving rise to plain error.

█ Regarding the remaining five statements made by the prosecutor (numbered 1, 5, 7, 13, and 14 above), to which Ganal did object, the reviewing court must determine whether the trial court abused its discretion in denying Ganal's motion for new trial on that basis. In his first statement, the prosecutor was questioning Mabel Ganal's credibility much like—although not as severely as—the prosecutor in *Marsh.* In the present case, however, the prosecutor's statements appear to have been made in a rambling fashion, with a less-than-accusatory tone. Rather than injecting personal opinion, the prosecutor appears to have invited the jury to question whether Mabel was telling the truth based on her testimony.

█ In response to the fifth, seventh, and thirteenth comments, Ganal objected to the prosecutor's statement, "what gives him the

---

24. HRPP Rule 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

right," contending that the statement belittled the statutorily recognized mitigating defense of extreme mental or emotional disturbance. Ganal argues that this comment, along with the prosecutor's use of the terms "excuse," "not being held accountable," and "stand up like a man," when referring to the mitigation, impermissibly denigrated the defense itself as opposed to its applicability to Ganal. This prejudice, Ganal argues, could not be cured by instructions to the jury.

The prosecution argues that, in context, the prosecutor was merely cautioning the jury not to excuse Ganal's conduct out of sympathy and was characterizing Ganal's expert's theories as invitations to give Ganal a "break," even though the proffered defense did not apply. We agree.

 With respect to the thirteenth comment, Ganal argues that the phrase, "he can't jump up and whack me," impermissibly referred to and reminded the jury of Ganal's previous violent outburst in the courtroom while David Touchette was on the witness stand. Ganal submits that the purpose of the remark was to remind the jurors of Ganal's previous outburst and to reinforce the image they had of him as a violent person, the prejudicial effect of which could not be remedied by curative instructions. The prosecution, on the other hand, unconvincingly argues that the prosecutor was actually referring to Ganal's counsel and not to Ganal. Although arguably ambiguous, it is fairly clear that the prosecutor was indeed referring to Ganal:

> He didn't know what was going on. What was going on? What's going on here guys, why you guys arresting me? That's part of his whole ploy? I know nothing, I black out, amnesia. I don't know if it was a slip or not, but [Ganal's counsel] says he was in Mokuleia, I thought he was in Makaha, but it doesn't matter, right, we know he was in Mokuleia.

> Unless you believe that these two guys ran all the way around Kaena Point to go hide his clothes at Mokuleia. And, you know, I'm being sarcastic and cynical and all of that and maybe it's unfair because he can't jump up and whack me if he wanted to. But, you know, it's the big shibai, this

whole story of amnesia, can't remember. Stand up like a man and say he did it, that's the—[Ganal objects].

However, in view of: (1) the fact that the jurors were all individually voir dired after Ganal's outburst and one juror was excused; (2) the fact that Ganal did not move for a mistrial against advice of counsel; and (3) the strength of the evidence adduced at trial, we do not believe that the comment, taken in context, was so prejudicial so as to merit reversal of the conviction and a new trial.

Regarding the fourteenth comment, Ganal argues that, because the case involved the deaths of five people, two of whom were infants and two elderly, emotions were "ripe to be abused," and the prosecution took advantage of the situation during closing arguments. The prosecution retorts by asserting that the prosecutor was merely suggesting that the jury could disbelieve Ganal's story because his testimony was inconsistent with his conduct.

On balance, as previously noted, the prosecutor's closing argument lacked the professionalism and decorum required of attorneys who practice before the bar of the courts of Hawai'i, and the comments made are precariously close to conduct constituting prosecutorial misconduct. However, taken in the context of the entire argument, and in view of the strength of the case against Ganal, we hold that none of the comments, alone or in combination, would lead us to the conclusion that the trial court abused its discretion in denying Ganal's Motion for New Trial.

### 2. Ganal's Outburst During David Touchette's Testimony.

 Ganal next argues that the trial court should have granted him a new trial because his own outburst in the courtroom during David's testimony, discussed *infra*, prejudiced the jury against him. During David's testimony, Ganal jumped up, grabbed a water pitcher on counsel's table, and lunged forward, yelling: "You're a fucking liar. I never said anything like that. You asshole." At that point, a deputy sheriff intervened, and the water pitcher fell to the ground and broke. Ganal's counsel also tried

to block Ganal from going forward. The trial court then took a recess. Later, the court examined each of the jurors individually, and, as a result, one juror was excused. Ganal, however, did not move for a mistrial.

Many courts have held that it is not an abuse of discretion for a trial court to deny a motion for mistrial based on a criminal defendant's own conduct, generally reasoning that to grant a mistrial under such circumstances would accord defendants an incentive to provoke mistrials whenever they might choose to do so. *See generally* Annotation, *Disruptive Conduct of Accused in Presence of Jury as Ground for Mistrial or Discharge of Jury,* 89 A.L.R.3d 960 (1979 and Supp. 1994). Thus, we hold that Ganal should not be rewarded for his misconduct, especially by a post-verdict grant of a new trial.

Moreover, many courts have upheld denials of motions for mistrial based on far more outrageous conduct. *See, e.g., United States v. Bentvena,* 319 F.2d 916 (2d Cir.) (trial court properly denied defendants' motion for mistrial where one defendant climbed into jury box and walked from one end to the other, pushing jurors who were seated in the front row and screaming vilifications at jurors; while being cross-examined, the same defendant picked up witness chair and threw it at prosecutor, shattering chair against jury box), *cert. denied,* 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); *Gordon v. State,* 609 N.E.2d 1085 (Ind.1993) (trial court did not err in denying defendant's motion for mistrial when, as defendant's wife left witness stand, defendant grabbed water pitcher and threw it in her direction); *State v. Olinghouse,* 605 S.W.2d 58 (Mo.1980) (trial court properly denied defendant's motion for mistrial based on grounds that his acts of pushing his counsel, who was conferring with him, causing counsel to fall against bench, and in loud voice, calling his counsel "son of a bitch"); *Morgan v. State,* 308 Ark. 627, 826 S.W.2d 271 (1992) (defendant not entitled to mistrial based upon his conduct in dropping his pants and exposing himself to expert witness where jury was instructed to disregard action); *Chamberlain v. State,* 453 S.W.2d 490 (Tex.Crim.1970) (trial court properly denied motion for mistrial where defen-

dant's co-indictee resisted being brought into courtroom; defendant joined in and began to kick officers).

We therefore hold that Ganal's post-trial motion for new trial based on the prejudicial effect of his own outbursts and actions in the courtroom was properly denied.

### E. Merger of Counts I and II—First Degree Murder and Attempted First Degree Murder.

Under Hawai'i's merger statute, a defendant may not be convicted of more than one offense if "one offense is included in the other, as defined in [HRS § 701–109(4) ]." HRS § 701–109(1)(a). An offense is included in another when, *inter alia,* "[i]t consists of an attempt to commit the offense charged or to commit an offense otherwise included therein[.]" HRS § 701–109(4)(b). Ganal argues that the trial court should have merged his convictions under Counts I and II of the indictment pursuant to HRS §§ 701–109(1)(a) and (4)(b) because attempted first degree murder is an included offense of first degree murder. The prosecution, on the other hand, argues that because Counts I and II concern different victims, HRS § 701–109(4)(b) does not apply to merge the convictions. Section 701–109(4)(b), the prosecution argues, applies only if the attempt is an attempt to commit *the offense charged,* and, as Count II did not concern the same victims, it was not an attempt to commit the offense charged in Count I. We disagree with the prosecution and agree with Ganal.

Prior to 1986, Hawai'i had one degree of murder, and the independent crime of murder in the first degree did not exist. Instead, HRS § 706–606 (1985) mandated the imposition of a sentence of life imprisonment without the possibility of parole for the murder of: (1) a peace officer while in the performance of his or her duties; (2) a person known by the defendant to be a witness in a murder prosecution; (3) a person by a hired killer, in which event both the person hired and the person responsible for hiring the killer were subject to punishment under HRS § 706–606; and (4) a person while the defendant was imprisoned. In 1986, the Hawai'i legislature amended HRS § 707–701,

creating the substantive offense of first degree murder, criminalizing murder under the criteria previously delineated under HRS § 706–606, and adding a new circumstance, the killing of "more than one person in the same or separate incident." 1986 Haw.Sess. L.Act 314, § 49 at 615–16.[25] By so including the new provision, the legislature intended to include serial killers within the purview of first degree murder. *See* Sen. Conf.Comm.Rep. No. 51–86, in 1986 Senate Journal, at 747 ("The offense of murder in the first degree is expanded to include the killing of more than one person in separate incidents. Your Committee intends that persons convicted of serial killings be subject to life imprisonment without parole."); *see also* Sen.Stand.Comm.Rep. No. 820–86, in 1986 Senate Journal, at 1168–69.

As written, the elements of first degree murder under HRS § 707–701(1)(a) therefore are that: (1) the defendant caused the death of more than one person in the same or separate incident; and (2) the defendant did so intentionally or knowingly. All that is required by the statute is that the defendant's requisite state of mind be to kill *multiple* people and that the defendant in fact cause the death of *multiple* people. The same principle applies to attempted murder in the first degree: a defendant commits attempted murder in the first degree when the defendant intentionally engages in conduct, which, under the circumstances as he or she believes them to be, constitutes a substantial step in a course of conduct intended or known to be practically certain to cause the death of more than one person in the same or separate incident. *See* HRS §§ 705–500(1)(b), 705–500(2), 707–701(1)(a), and 702–206(2)(c). Thus, merger of convictions for murder in the first degree and attempted murder in the first degree under HRS §§ 701–109(1)(a) and (4)(b) may be appropriate despite the fact that the substantive charge and the attempt charge are based on two distinct groups of victims. In other words, the fact that a substantive charge and an attempt charge are based on two distinct groups of victims will not, in itself, preclude the application of statutory merger under HRS §§ 701–109(1)(a) and (4)(b).

■ Yet this is not to say that statutory merger will apply to all convictions for first degree murder and attempted first degree murder where the two convictions concern distinct groups of victims. The dispositive issue is the character of the defendant's requisite homicidal state of mind. As we noted in *State v. Castro*, 69 Haw. 633, 653, 756 P.2d 1033, 1047 (1988):

> The test to determine whether the defendant intended to commit more than one offense in the course of a criminal episode is whether the evidence discloses one general intent or discloses separate and distinct intents. If there is but one intention, one general impulse, and one plan, there is but one offense.

*Id.* (citations omitted); *see also State v. Alston*, 75 Haw. 517, 531, 865 P.2d 157, 165 (1994). In the present case, Ganal convincingly argues that he started one fire with a single intent to kill in Kailua; yet Joshua and Kalah Touchette formed part of the basis for the first degree murder count, and Michael and Wendy formed part of the basis for the attempted first degree murder count. Ganal essentially argues that the fact that he started one fire at Kailua establishes that he had one intent to kill that spanned both the first degree murder and the attempted first degree murder counts. We agree. Given the fact that the jury determined that Ganal intended to kill all of the occupants at the Touchette home, we believe that it is impossible for anyone logically to conclude that Ganal, having started a single fire at the Touchette home in Kailua, possessed anything other than a single intent to cause the deaths of all of the occupants therein.

However, the number and the respective locations of the victims raises the potential that each of the charges was independently supportable.[26] As previously noted, Ganal

---

25. *See supra* note 2. To date, Hawai'i is the only state in the nation that has included the criterion of "more than one person in the same or separate incident" as an element of the substantive crime of a degree of murder.

26. We note that, because of the relatively large number of victims involved in the present case, the prosecution could have framed the charges in a number of different ways, some of which likely would be more conducive of a finding of a sepa-

was charged with the first degree murder of four individuals—two in Waipahu and two in Kailua—and was charged with the attempted first degree murder of three individuals—one in Waipahu and two in Kailua. All the first degree murder statute requires is the requisite state of mind to cause the deaths of more than one person. Even assuming that Ganal harbored a single intent to kill all of the victims in Kailua, the possibility that Ganal possessed a separate and independent intent to kill the two victims who died in Waipahu, Aradina and Santiago Dela Cruz, remains, thereby supporting the charge of first degree murder. In other words, the potential exists that the jury could have found that Ganal possessed one requisite state of mind to kill the four victims in Kailua, which satisfied the *mens rea* element of the charge of attempted first degree murder, and that Ganal possessed a separate requisite state of mind associated with the killings of Aradina and Santiago Dela Cruz, distinct from that associated with his actions in Kailua, that satisfied the *mens rea* element of the charge of first degree murder.

Our review of the record, however, reveals that, in view of the manner in which the jury was instructed regarding the first degree murder and attempted first degree murder charges, the jury's verdict of guilty on both counts necessarily involved a finding that Ganal possessed a single intent to kill *all* of the victims involved in *each* count. Because the relevant instructions specifically named each of the victims that formed the groups of people that in turn formed the basis of each count, the instructions necessarily *required* the jury to find that Ganal possessed the requisite state of mind to kill the *specific group* of people that formed the basis of each count in order to find Ganal guilty of each count. The relevant instruction read to the jury (requested by Ganal and given with the prosecution's agreement) regarding first degree murder provided:

rate intent to cause the death of more than one person in the same or separate incident. For example, Ganal could have been charged with separate charges of first degree murder for the deaths of the Dela Cruzes in Waipahu and the Touchette children in Kailua, and a charge of attempted first degree murder for the injuries caused to Michael and Wendy. If so charged, the jury could have concluded that Ganal possessed separate intents to kill, separated by location. Although the attempted first degree murder charge for Michael and Wendy would have merged into the first degree murder charge for Joshua and Kalah, as charged, Ganal potentially could have been convicted of two counts of first degree murder and one count of attempted second degree murder.

Moreover, in view of our decision in *Briones v. State*, 74 Haw. 442, 848 P.2d 966 (1993), where we held that second degree murder is not an included offense of first degree murder because the two crimes entail different requisite states of mind, Ganal could have been charged with the attempted second degree murder of Mabel in Waipahu, and the counts would not have been subject to merger.

However, we further note that the 1996 Hawai'i legislature, cognizant of our holding in *Briones*, and following the recommendation of the Final Report of the Committee to Conduct Comprehensive Review of the Hawai'i Penal Code, passed Act 15, which provides prosecutors with an elegantly simple option when charging a multiple victim murder case. Act 15 effectively vests in the sentencing court the discretion to sentence a defendant convicted of second degree murder who was previously—or simultaneous-ly—convicted of a murder, to life imprisonment without the possibility of parole. Act 15, which amends HRS § 706–657 effective April 22, 1996, provides in pertinent part that:

> The court may sentence a person who has been convicted of murder in the second degree to life imprisonment without possibility of parole under section 706–656 if the court finds ... that the person was previously convicted of the offense of murder in the first degree or murder in the second degree in this State or was previously convicted in another jurisdiction of an offense that would constitute murder in the first degree or murder in the second degree in this State.... "[P]reviously convicted" means a sentence imposed at the same time or a sentence previously imposed which has not been set aside, reversed, or vacated.

1996 Haw.Sess.L. Act 15 at ——.

Thus, as a practical matter, because Act 15 vests in the sentencing judge the discretion to impose the penalty of life imprisonment without the possibility of parole for convictions of multiple second degree murder, prosecutors need not be limited to charging a defendant in a multiple victim murder case with first degree murder in order to present the potential for the imposition of a sentence of life imprisonment without the possibility of parole. Pursuant to the options created by Act 15, prosecutors may hereafter charge individual counts of second degree murder for each victim in a multiple victim murder case, continue to preserve the potential for the imposition of a sentence of life imprisonment without parole, and avoid the merger implications raised by *Briones* altogether.

The Defendant, ORLANDO GANAL, SR., is charged in Count I with committing the offense of Murder in the First Degree.

A person commits the offense of Murder in the First Degree if he intentionally or knowingly causes the death of more than one person in the same or separate incident.

There two are [sic] material elements to the offense of Murder in the First Degree, each of which must be proven by the Prosecution beyond a reasonable doubt. These two material elements are:

1. That ORLANDO GANAL, SR. caused the deaths *of Aradina Dela Cruz, Santiago Dela Cruz, Kalah Touchette and Joshua Touchette* in the same or separate incident;

2. That he did so intentionally or knowingly.

(Emphasis added.)

The relevant instruction on attempted first degree murder (requested by the prosecution and given as modified by agreement) provided:

The Defendant, ORLANDO GANAL, SR., is charged with the offense of Attempted Murder in the First Degree.

A person commits the offense of Attempted Murder in the First Degree if he intentionally engages in conduct which constitutes a substantial step in a course of conduct intended or known to cause the death of more than one person in the same or separate incident.

There are two material elements to the offense of Attempted Murder in the First Degree, each of which must be proven beyond a reasonable doubt. These two elements are:

1. That the Defendant did intentionally engage in conduct, to wit, by shooting Mabel Ganal and by burning the Touchette residence;

2. That such conduct constituted a substantial step in a course of conduct intended or known to cause the death of more than one person, *to wit, Mabel Ganal,*

*Michael Touchette, and Wendy Touchette,* in the same or separate incident.

(Emphasis added.)

Presuming, as we do on appeal, that a jury will heed a trial court's instructions, *see, e.g., State v. Estrada,* 69 Haw. 204, 222, 738 P.2d 812, 825 (1987), the jury was not free to rearrange the victims, or to leave some of the victims out of their findings regarding Ganal's intent in order to convict Ganal of each of the homicide counts. Therefore, the jury's verdicts of guilty with regard to the first degree murder and attempted first degree murder charges necessarily included a finding that Ganal possessed a single intent to kill the specific group of victims named in each count. In other words, the jury's verdict of guilty on the first degree murder count necessarily meant that the jury found that Ganal possessed the requisite intent to kill the group of people specifically consisting of Aradina Dela Cruz, Santiago Dela Cruz, Joshua Touchette, and Kalah Touchette. Similarly, the jury's verdict of guilty on the attempted first degree murder count necessarily meant that the jury found that Ganal possessed the requisite state of mind to kill the group of people specifically consisting of Mabel Ganal, Michael Touchette, and Wendy Touchette.

Accordingly, in view of: (1) the findings regarding the character of Ganal's state of mind necessarily made by the jury associated with its verdict finding Ganal guilty of first degree murder and attempted first degree murder; and (2) our view that it is impossible for anyone logically to conclude that Ganal, having started a single fire at the Touchette home in Kailua, possessed anything other than a single intent to cause the death of all of the victims therein, we conclude that Ganal possessed a single intent to cause the death of all of the victims named in both the first degree murder and attempted first degree murder counts of the indictment. Consequently, we hold that the trial court erred in declining to apply HRS §§ 701–109(1)(a) and (4)(b) to merge Ganal's conviction for attempted first degree murder pursuant to Count II of the indictment into his conviction for first degree murder pursuant to Count I of the indictment, because Count II "consists

of an attempt to commit the offense charged" in Count I.[27]

The dissent disagrees with this conclusion and raises two principal arguments against merger in the present case: (1) other jurisdictions allow multiple convictions when a defendant's actions injures multiple victims; and (2) Ganal committed two separate statutory offenses based on independent acts. The dissent's arguments, however, miss the mark and we discuss each in turn.

First, as previously noted, the multiple-victim provision of Hawai'i's first degree murder statute is unique, and the dissent's reliance on case law from other jurisdictions to support its interpretation of HRS § 707–701(1)(a) is inapposite. Indeed, two of the three cases relied upon by the dissent for the proposition that multiple convictions for multiple victims is appropriate are based on murder statutes from other jurisdictions that bear no resemblance to HRS § 707–701(1)(a) and thus provide little guidance in the merger analysis in the present case, *see Austin v. State*, 271 N.W.2d 668, 671 (Wis.1978) ("Under the first degree murder statute, one is guilty if he or she 'causes the death of another human being with intent to kill that person or another.' Sec. 940.01(1), Stats.") and *Butler v. State*, 622 N.E.2d 1035, 1038 (Ind. Ct.App.1993) ("[Ind.Code] 35–42–1–1 imposes liability on a defendant who knowingly or intentionally kills *another human being*." (Emphasis in original.)). The third case relied upon by the dissent, *United States v. Shaw*, 701 F.2d 367, 396 (5th Cir.1983), is a federal case dealing with the propriety of the imposition of enhanced sentencing for violations of two federal statutes, 18 U.S.C. § 1111(a), proscribing first degree murder,

and 18 U.S.C. § 113(a), proscribing assault with intent to murder, where each is committed with a firearm, and is inapposite. The murder statute discussed in *Shaw*, 18 U.S.C. § 1111(a), provides in pertinent part that "[m]urder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing ... is murder in the first degree. Any other murder is murder in the second degree." 701 F.2d at 392. Like the statutes at issue in *Austin* and *Butler*, the murder statute in *Shaw* speaks nothing of multiple victims.

Second, the dissent's contention that, in keeping with the reasoning of the above-cited cases, merger under HRS § 701–109(1)(a) is inappropriate because Ganal's conduct violated two separate statutes, essentially amounts to nothing more than a restatement of the fact that first degree murder and attempted first degree murder are independently proscribed in the Hawai'i Penal Code. This contention lends no assistance to our task of assessing the propriety of the trial court's application of HRS § 701–109 to the facts of the present case.

The dissent goes to great lengths to elucidate the difference between first degree murder and attempted first degree murder, asserting that the elements of first degree murder include "the consummating element of death," dissenting opinion at 387, 917 P.2d at 399, and that the substantive crime and the attempt have "different state of mind elements," dissenting opinion at 388, 917 P.2d at 400, in that attempt is a "specific intent" crime, while murder is a "general intent" crime.[28] *Id.* Although we do not disagree

27. Because we merge Ganal's convictions pursuant to HRS §§ 701–109(1)(a) and (4)(b), we do not address Ganal's arguments for merger pursuant to HRS §§ 701–109(1)(e).

28. To the extent that the dissent contends that the state of mind requirement for first degree murder is functionally identical to the state of mind requirement of second degree murder, we point to our holding in *Briones*, where we clarified the state of mind requirement for first degree murder and explicitly noted that:

A conviction for first degree murder may occur, *inter alia*, when a person "intentionally or knowingly causes the death of ... more than

one person in the same or separate incident." HRS § 707–701(a) (Supp.1992). Several convictions of second degree murder may instead ensue if the multiple deaths result from acts committed with separate states of mind.

. . . .

Prior counsel harbored a fundamental misapprehension of the relationship between the first and second degree murder. Counsel argued that as long as an actor caused the death of two or more people he or she could be convicted, barring other defenses of first degree murder. Such a conviction would be possible, he asserted, whether or not the killings occurred in related or unrelated incidents.

that first degree murder and attempted first degree murder are in fact two separate offenses under our Penal Code, the dissent is misguided to the extent that it suggests that the fact of independent statutory proscription has any effect on the application of merger; to the contrary, merger can, by definition, only occur where two crimes are separately proscribed.

The dissent's reliance on seemingly inapposite authority and preoccupation with the separateness of the charges that form the basis of Counts I and II of the indictment against Ganal highlights the dissent's misapprehension of the controlling principles governing the merger analysis in the present case. It is true that: (1) the charges are founded on independent statutory grounds; (2) Ganal engaged in independent acts with respect to Counts I and II; (3) the counts concern different victims; and (4) the legislature amended HRS § 707–701(1)(a) to include serial killers within the purview of first degree murder. However, these facts ultimately are of little assistance to our assessment of the propriety of the trial court's resolution of the merger issue in the present case. As previously noted, in an analysis of merger under HRS § 701–109(1)(a) and (4)(b), the question of when merger will apply to convictions for first degree murder and attempted first degree murder, where the two convictions concern distinct groups of victims, is governed by the character of the defendant's requisite homicidal state of mind. Where a defendant acts with a single intent with regard to all the victims involved in counts for first degree murder and attempted first degree murder, the counts must merge pursuant to HRS § 701–109(1)(a) and (4)(b).

The dissent asserts that because "HRS § 707–701(1)(a) applies to '*serial killings*' resulting from '*separate incidents*' ... a murderer does *not* have to possess a 'single intent' with respect to all of the intended victims in order to be guilty of first degree

This interpretation fails to account for the greater culpability of the more serious offense, is clearly contrary to the legislative history, and violates HRS § 701–109(c). 74 Haw. at 454–57, 848 P.2d at 973–74. In view of the unique character of the state of mind

murder," dissenting opinion at 389, 917 P.2d 401 (emphasis in original), and that we "cannot and do[ ] not cite any statutory authority or legislative history supporting [our] flawed interpretation." *Id.* These assertions, however, misapprehend our holding. The requisite intent for first degree murder is an intent to kill multiple people. This is not to say, however, that the intent to kill *must* encompass *all* of the victims killed during a course of criminal conduct. On the other hand, if the defendant's intent to kill *does* encompass all of the victims, separate additional convictions of second degree murder for the individuals included within the defendant's intent to kill, or separate additional convictions of smaller groups of individuals included within the defendant's intent to kill, must be vacated pursuant to the principles of merger. This result is an inescapable consequence of the very intent of the legislature expressed during its amendment of HRS § 707–701 emphasized by the dissent that enabled prosecution and conviction for "serial" killings committed in separate incidents. Pursuant to HRS § 707–701(1)(a), and subject to proof, a defendant may be prosecuted for and convicted of multiple-victim first degree murder for the killing of more than one person in separate incidents. However, the principles of merger embodied in HRS § 701–109 mandate that, if it is determined that the defendant's intent to kill spanned space and time to encompass the killing of victims over separate incidents, the defendant cannot also be convicted of the murders of the victims individually. Similarly, as in the present case, which involves numerous victims, HRS § 701–109 likewise mandates that the defendant cannot also be convicted of the murder of any subset of the group of victims that is included within the scope of the defendant's intent to kill.

■ As we made clear in *Briones,* the requisite intent for first degree murder in violation of HRS § 707–701(1)(a) is unique:

required for multiple-victim first degree murder as noted in *Briones,* the dissent's contention that *all* "completed murders" are "general intent" crimes is suspect.

Finally, we examine the case of an actor who causes the death of two or more people in incidents separated in time but without the intent to cause both deaths as part of a common scheme or plan. For example, an actor, in the course of committing robbery of a convenience store, shoots and kills an employee. Afterwards, a passerby is shot and killed by the actor attempting to escape. Although two people were killed in separate incidents during the same criminal episode, the actor may not be guilty of first degree murder because the requisite state of mind to cause the death of two or more people in the same or separate incident arguably is lacking. The actor would possibly be guilty, however, of two separate counts of second degree murder.

As the examples indicate, the murder or attempted murder of two or more persons by a single actor may or may not be committed with separate states of mind. The legislature recognized these distinctions when it amended HRS § 707–701 in 1986 to broaden the first degree murder category. Both the House and Senate stated, "[y]our Committee intends that persons convicted of serial killings be subject to life imprisonment without parole." Serial killings are, by definition, therefore, related events. *The state of mind of the accused provides the relationship between the murders of a serial killer and is the distinguishing factor between separate counts of second degree murder and one count of first degree murder. The state of mind with which the actor acts must be clearly and unambiguously established in order to sustain a first or second degree murder conviction.*

*Briones,* 74 Haw. at 455–56, 848 P.2d at 973–74 (footnotes omitted; emphasis added). Thus, the state of mind of the defendant at the time he or she kills his or her victims will determine the number of charged crimes of which the defendant may properly be convicted, and merger is the means by which charging schemes that do not comport with the defendant's state of mind are corrected. For example, where a defendant shoots four people with a gun, the question whether the defendant may properly be convicted of first

or second degree murder is ultimately determined by the nature of the defendant's intent to kill. If the trier of fact determines that the defendant had possessed separate intents to kill four individuals, four separate convictions of second degree murder for each of the victims would be proper, and one conviction of first degree murder for the four victims as a group, or two convictions of two groups of two people, would not be proper. Similarly, if the trier of fact determines that the defendant had intended to kill two groups of two people each, two convictions of first degree murder would be proper, and four convictions of second degree murder would not be proper. Finally, if, as in the present case, the defendant intended to kill one group of all of the victims, then one conviction of first degree murder would be proper, but two convictions of first degree murder would not. This principle remains true even when some of the victims are involved in an attempt charge.

▬ We do not hold, as the dissent contends we do, that all first degree murder charges must be supported by an intent to kill all of the victims involved in a defendant's course of criminal conduct, *see* Dissenting opinion at 389, 917 P.2d at 401; we do hold, however, that, where a defendant's intent to kill multiple people encompasses all of the victims involved in the defendant's course of criminal conduct, that is, a single intent, only one count of first degree murder is appropriate.

Finally, we take issue with the dissent's contention that, by our application of merger in the present case, "Ganal escapes accountability for the attempted first degree murder of Mabel Ganal, Michael Touchette and Wendy Touchette, when, in fact, these people were clearly the victims of Ganal's attempted first degree murder." Dissenting opinion at 390, 917 P.2d at 402. The application of merger in the present case constitutes a judicial recognition, pursuant to the legislature's statutory directive, of the singular character of Ganal's intent. It does not in any way lessen Ganal's "accountability" for his actions, diminish the deplorability of his conduct, or most importantly, diminish or discount the tragic consequences of Ganal's

actions on Mabel, Wendy, and Michael. As punishment for first degree murder, Ganal received the most severe sanction available under our system of criminal justice: life imprisonment without the possibility of parole. This sentence remains valid and applicable to Ganal despite the merger of Counts I and II, and, as a practical matter, is functionally equivalent to the sentence Ganal would have received had merger not been applied.[29]

## IV. CONCLUSION

Based on the foregoing discussion, Ganal's convictions as to Counts II and III are reversed. The convictions and sentences as to all the remaining Counts of the indictment are affirmed.

NAKAYAMA, Justice, concurring and dissenting.

I concur with the majority opinion except as to part III.E. Because I believe that Ganal's conviction in Count II for the attempted first degree murder of Mabel Ganal, Michael Touchette and Wendy Touchette does not merge with his conviction in Count I for the first degree murder of Aradina Dela Cruz, Santiago Dela Cruz, Joshua Touchette and Kalah Touchette, I respectfully dissent from part III.E.

After the jury returned a verdict of guilty for Count I (first degree murder) and Count II (attempted first degree murder), Ganal filed a motion to dismiss Count II, arguing that, under Hawai'i Revised Statutes (HRS) § 701–109, separate charges for a completed crime and an attempt to commit that same crime must merge when the defendant has been convicted for the completed crime. The trial judge denied Ganal's motion, because Counts I and II involved two different sets of victims, two different statutory offenses, as well as independent facts. Today the majority reverses the judge's decision, holding that Counts I and II must merge pursuant to

HRS §§ 701–109(1)(a) and (4)(b) because the majority believes Ganal had a "single intent" with respect to all seven of his intended victims. In contrast with the majority, however, I agree with the trial court that merger is not applicable in the instant case, because Counts I and II involved two different sets of victims, two different statutory offenses, as well as independent facts.

Because the unique language of HRS § 707–701(1)(a) (Supp.1992) provides that "[a] person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of ... [m]ore than one person in the same or separate incident" (emphasis added), the majority starts with a premise that "the jury's verdicts of guilty with regard to the first degree murder and attempted first degree murder charges necessarily included a finding that Ganal possessed a single intent to kill the specific group of victims named in each count." Majority at 379, 917 P.2d at 391. With this premise in mind, the majority focuses on the fact that Ganal set fire to the Touchette home in Kailua when all four of the Touchettes were together, and as a consequence Joshua and Kalah Touchette immediately died and became named victims in the first degree murder count, while Michael[1] and Wendy Touchette survived and became named victims in the attempted first degree murder count. The majority believes "it is impossible for anyone logically to conclude that Ganal, having started a single fire at the Touchette home in Kailua, possessed anything other than a single intent to cause the death of all of the victims therein," and thus, "Ganal possessed a single intent to cause the death of all of the victims named in both the first degree murder and attempted first degree murder counts of the indictment." Majority at 381, 917 P.2d at 393. The majority concludes that, because it believes Ganal possessed a "single intent" to cause the deaths of all of the victims in both counts, Count I

---

**29.** Moreover, we reiterate that, pursuant to the options presented to the prosecution by Act 15, passed by the 1996 legislature, the application of merger in all future multiple victim murder cases may be avoided altogether, by the prosecution's charging of individual counts of second degree murder for each victim. *See supra* note 26.

**1.** Although Michael Touchette initially survived Ganal's attack on August 25, 1991, and became a named victim of *attempted* first degree murder in Count II, he eventually died on September 23, 1991, as a result of complications related to severe burns over eighty percent of his body.

and Count II must merge pursuant to HRS §§ 701–109(1)(a) and (4)(b). Majority at 383, 917 P.2d at 395.

However, regardless of whether Ganal possessed a "single intent" with respect to all seven of his intended victims, Counts I and II should not merge pursuant to HRS §§ 701–109(1)(a) and (4)(b) (1985):

§ 701–109 **Method of prosecution when conduct establishes an element of more than one offense.** (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. *He may not, however, be convicted of more than one offense if:*

(a) *One offense is included in the other,* as defined in subsection (4) of this section; . . . .

(4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. *An offense is so included when:*

(b) *It consists of an attempt to commit the offense charged* or to commit an offense otherwise included therein; . . . .

(Emphasis added). Contrary to the majority's assertion, Count II did not consist of Ganal's attempt to commit Count I. While Count II charged Ganal with the attempted first degree murder of the three *surviving* victims, i.e., Mabel Ganal, Michael Touchette and Wendy Touchette, Count I charged Ganal with the first degree murder of four completely *different* persons, namely the four *deceased* victims: Aradina Dela Cruz, Santiago Dela Cruz, Joshua Touchette and Kalah Touchette. Counts I and II clearly involved different offenses, different victims, different proof, and different results, and thus, Counts I and II should not merge pursuant to HRS §§ 701–109(1)(a) and (4)(b).

According to R. Owens' *Alabama's Minority Status: A Single Criminal Act Injuring Multiple Persons Constitutes Only a Single Offense,* 16 Cumb.L.Rev. 85, 89–90 (1985–1986), a majority of jurisdictions allow multiple convictions when a defendant's single volitional act injures multiple victims. Thus, analogous cases in other jurisdictions show that a count for attempted murder does not merge with a count for murder when the two counts involve two different sets of victims.

"As a general rule when *different victims* are involved, there is a corresponding number of *distinct crimes.*" *Austin v. State,* 271 N.W.2d 668, 672 (Wis.1978) (emphasis added), *disapproved on other grounds by State v. Poellinger,* 451 N.W.2d 752, 757 (Wis. 1990). Thus, in *Austin* the Supreme Court of Wisconsin affirmed a defendant's conviction for both the attempted first degree murder of a man named Simmons and the first degree murder of a man named Wortham, even though both offenses were the result of the defendant's *single intent* to kill Simmons and his *single volitional act* of firing a shotgun blast in the direction of Simmons that "only slightly injured Simmons but killed Willie Wortham, a friend of the defendant's who happened to be standing near Simmons at the time." *Austin,* 271 N.W.2d at 669. The defendant "argue[d] that his conviction for both murder and attempted murder was barred by" statutes that "define[d] an included crime as 'an attempt . . . to commit the crime charged.'" *Id.* at 672. The defendant further argued "that because of the 'transfer of intent' which is part of the first-degree murder statute, the attempt to kill Simmons [and] the actual killing of Wortham [we]re part of the *same act* and part of the same crime of the first-degree murder of Wortham." *Id.* (emphasis added). Nevertheless, the *Austin* court held that, "[s]ince an attempt does require proof of a fact (some extraneous act preventing the completed crime) not required for conviction of the completed crime, *conviction for both is proper* . . . where there are *two victims.*" *Id.* (emphasis added).

The statutes cited by the defendant address the situation in which there is only one victim and quite sensibly preclude conviction for both the successful and the attempted murder of the same victim. In such a case, the *attempted murder* truly is the *inchoate* form of the murder. It is anomalous to contend that the attempted murder of Simmons is actually the *murder* of Wortham in *choate* form. Taking a

common sense view, we conclude this argument is without merit.

*Id.* (emphasis added).

Likewise, the Court of Appeals of Indiana affirmed a defendant's conviction for both the murder of a man named Allison and the attempted murder of another man named Lark, even though the defendant "had only *one intent* to kill, the intent to kill Lark[.]" *Butler v. State*, 622 N.E.2d 1035, 1038 (Ind. Ct.App.1993) (emphasis added). The defendant had aimed and fired his gun at Lark, but in the last split-second Lark had pushed Allison into the deadly path of the on-coming bullet, causing Allison to suffer a fatal chest wound. With respect to the two separate offenses of (1) the murder of Allison and (2) the attempted murder of Lark, the *Butler* court noted that "the State was required, for each offense, to prove an additional fact which the other offense did not require, namely the identity of *separate victims.*" *Id.* (emphasis added). "Even if it were correct to argue that [the defendant] harbored only *one intent,* the intent to kill Lark, he will not find relief under double jeopardy where, as here, he committed *two separate offenses.*" *Id.* (emphasis added). "Each of the offenses included one element not included in the other—*a different victim.* The offenses, therefore, *do not merge* and [the defendant] may properly be sentenced separately and consecutively for each offense." *Id.* (emphasis added).

Where a defendant had fired a single bullet at a car, killing one passenger and injuring a second passenger in the hip, the Fifth Circuit affirmed the defendant's conviction for, among other things, the first degree murder of the dead passenger and the assault with intent to murder the injured passenger. *United States v. Shaw,* 701 F.2d 367, 396–97 (5th Cir.1983), *cert. denied, Shaw v. United States,* 465 U.S. 1067, 104 S.Ct. 1419, 79 L.Ed.2d 744 (1984). The defendant "claim[ed] that Count Four, charging him with assault with intent to murder, [wa]s multiplicitous to Count Two which charged him with first degree murder, because *one discharge of a firearm* should result in one punishment, even if *two people* are hit by the bullet." *Id.* at 396 (emphasis added). How-

ever, the Fifth Circuit held that a "single act may cause more than a single consequence; therefore, a defendant may be convicted of *two separate offenses* arising from a *single act* so long as each requires proof of a fact not essential to the other." *Id.* (emphasis). "Here, [the defendant] is charged under *two discrete federal statutes* with causing *two distinct types of harm* to *two different persons.*" *Id.* at 397 (emphasis added). The defendant's "conviction on both counts was proper." *Id.*

Similarly in the instant case, Ganal was charged with committing murder and attempted murder against two different sets of victims: (1) the deceased victims of Count I, and (2) the surviving victims of Count II. These two sets of victims were certainly no more fungible than the two different types of harm that they suffered. Each of the two sets of victims represented a separate and distinct interest of society. Therefore, even where Ganal utilized a single volitional act to simultaneously harm both sets of victims, Ganal invaded at least two separate and distinct interests of society.

Here, this is important because, like the defendants in the above cases, Ganal invaded two separate and distinct interests of society by violating two different statutory offenses: (1) first degree murder under HRS § 707–701(1)(a) (Supp.1992), and (2) attempted first degree murder under HRS § 705–500 (1985). When these two different statutory offenses concern two different sets of victims, the consummating element of death clearly distinguishes the deceased victims of first degree murder from the surviving victims of attempted first degree murder. Thus, while the prosecution had to show that Ganal's actions caused the deaths of Aradina Dela Cruz, Santiago Dela Cruz, Joshua Touchette and Kalah Touchette in order to convict Ganal of first degree murder in Count I, the prosecution did not have to make such a showing in order to convict Ganal of the attempted first degree murder of Mabel Ganal, Michael Touchette and Wendy Touchette in Count II.

In addition to first degree murder having the consummating element of death, first degree murder also differs from attempted

first degree murder in that a completed crime has a different state of mind element than an attempted crime. "To constitute an attempt, the inchoate behavior must be intentional, i.e., purposeful." Commentary to HRS § 705–500 (1985); *see also State v. Faulkner*, 61 Haw. 177, 178, 599 P.2d 285, 286 (1979) ("Intent is an essential element of the crime of criminal attempt"). Accordingly, Ganal's conviction for attempted first degree murder in Count II required the jury to find that Ganal acted with the specific intent to kill Mabel Ganal, Michael Touchette and Wendy Touchette. *Cf. State v. Mendonca*, 68 Haw. 280, 285, 711 P.2d 731, 735 (1985). In contrast with an attempted murder, a completed murder is a "general intent" crime. *Cf. State v. Kane*, 3 Haw.App. 450, 457–58 n. 5, 652 P.2d 642, 647 n. 5 (1982). The jury did not have to find that Ganal acted with an "intentional" state of mind in order to convict Ganal of first degree murder in Count I, but rather, the jury merely needed to find that Ganal acted "knowingly" when he killed Aradina Dela Cruz, Santiago Dela Cruz, Joshua Touchette and Kalah Touchette. HRS § 707–701(1) (Supp.1992).

> The difference between acting intentionally … and knowingly … is narrow but nonetheless distinct. The distinction lies in the fact that intent is characterized by a conscious object to engage in certain conduct or cause a certain result whereas knowledge is characterized by an awareness that conduct is of a certain type or that a certain result will almost certainly obtain. While knowledge will in most instances suffice to establish penal liability, *there are a limited number of offenses which require an intent to effect a particular result*.

Commentary to HRS § 702–206 (1985) (emphasis added). Thus, in addition to the consummating element of death, first degree murder and attempted first degree murder also differ in that they have different state of mind elements. Ganal clearly committed two different statutory offenses.

Finally, Ganal committed independent acts with respect to Counts I and II. For example, Ganal fired separate and independent gun shots at Aradina and Santiago Dela Cruz (deceased victims in Count I) and Mabel Ganal (a surviving victim in Count II). Each of Ganal's gun shots constituted a separate and independent act. And as stated, Ganal also committed different "acts" in that he killed the deceased victims of Count I while he tried but failed to kill the surviving victims of Count II. "[W]here a defendant in the context of one criminal scheme or transaction commits several *acts* independently violative of one or more statutes, he may be punished for all of them if charges are properly consolidated by the State in one trial." *State v. Pilago*, 65 Haw. 22, 24, 649 P.2d 363, 365 (1982) (emphasis added) (affirming a conviction for possession of a prohibited firearm, receiving, retaining or disposing of stolen property (firearm), and possession of a firearm by a person convicted of certain crimes); *State v. Pia*, 55 Haw. 14, 19, 514 P.2d 580, 585 (1973) (holding that a prosecution for both (a) assault or battery on a police officer in the performance of his duties with the intent to obstruct the officer in the discharge of those duties and (b) willful interference with a police officer while such officer is lawfully executing his duties did not violate the prohibition against double jeopardy). Counts I and II were adjudicated within the same trial, and the record shows that Ganal committed at *least* two separate "acts" independently violative of more than one statute. Under these circumstances, merger pursuant to HRS §§ 701–109(1)(a) and (4)(b) is clearly unwarranted.

Merger pursuant to HRS §§ 701–109(1)(a) and (4)(b) addresses a different situation than the instant case in which a defendant is charged with both the first degree murder and the attempted first degree murder of a *single set* of victims, *all of whom die*. Under such circumstances, merger quite sensibly precludes conviction for both the completed and the attempted first degree murder of the same victims, because attempted first degree murder is the *inchoate* form of the first degree murder.

In the instant case, however, where Count I involves only Ganal's deceased victims and Count II involves only Ganal's surviving victims, it is anomalous for the majority to contend that the attempted murder of the

surviving victims is actually the murder of the deceased victims in *choate* form. Thus, it is clearly wrong for the majority to merge these two different statutory offenses when, as here, Ganal was charged with causing two different types of harm to two different sets of victims, through various independent acts.

The majority insists that the merger of all multiple-victim first degree murder charges is required because the majority believes that a first degree murderer necessarily has a "single intent" with respect to all of the intended victims. For example, the majority states the following:

> If the trier of fact determines that the defendant had possessed separate intents to kill four individuals, four separate convictions for second degree murder for each of the victims would be proper, and one conviction for first degree murder for the four victims as a group, or two convictions for two groups of two people, would not be proper.

Majority at 384, 917 P.2d at 396. However, neither the language nor the legislative history of HRS § 707–701(1)(a) requires that a murderer must have a "single intent" with respect to all of the intended victims in order to support a conviction for first degree murder, and thus, the majority cannot and does not cite any statutory language or legislative history supporting its flawed interpretation.

In 1986, when the Hawai'i legislature enacted the statutory offense of first degree murder by amending HRS § 707–701, the Hawai'i legislature specifically intended "that persons convicted of *serial killings* be subject to life imprisonment without parole." Conf.Comm.Rep. No. 51–86 in 1986 House Journal at 937, and in 1986 Senate Journal at 747 (emphasis added). Thus, "[t]he offense of murder in the first degree [wa]s *expanded to include* the killing of more than one person in *separate incidents.*" Conf.Comm.Rep. No. 51–86 in 1986 House Journal at 937, and in 1986 Senate Journal at 747 (emphasis added).

The fact that HRS § 707–701(1)(a) applies to "*serial killings*" resulting from "*separate incidents*" shows me that a murderer does *not* have to possess a "single intent" with respect to all of the intended victims in order to be guilty of first degree murder. Some serial killers intentionally kill their victims one person at a time, through separate incidents over the course of many years. By including "serial killings" and "separate incidents" within the sphere of HRS § 707–701(1)(a), the Hawai'i legislature clearly intended to make it easier for courts to hold persons accountable for first degree murder, regardless of whether they have a "single intent" with respect to all of their prospective victims.

The majority's application of merger today also conflicts with the legislative intent of HRS § 701–707(1)(a) by effectively improving Ganal's chances for obtaining parole after twenty years. When enacting HRS § 701–707(1)(a), the Hawai'i legislature specifically "intend[ed] that persons convicted of serial killings be subject to life imprisonment *without* parole." Conf.Comm.Rep. No. 51–86 in 1986 House Journal at 937, and in 1986 Senate Journal at 747 (emphasis added). Although Ganal's conviction for first degree murder has required Ganal to "be sentenced to life imprisonment without possibility of parole[,]" HRS § 706–656(1) (1993), the phrase "life imprisonment without possibility of parole" does not necessarily mean that Ganal will spend the remainder of his life behind bars. "As part of such sentence the court shall order the director of the department of public safety and the Hawaii paroling authority to prepare an application for the governor to *commute* the sentence to life imprisonment *with parole* at the end of twenty years of imprisonment[.]" Haw.Rev.Stat. § 706–656(1) (1993) (emphasis added). If the governor of Hawai'i commutes Ganal's sentence to life imprisonment *with parole*, the Hawai'i paroling authority will review Ganal's record in order to determine whether Ganal is worthy of parole. Due to the majority's application of merger today, Ganal's record will *not* show that he was convicted of the attempted first degree murder of Mabel Ganal, Michael Touchette and Wendy Touchette. Thus, Ganal's record will not accurately reflect the magnitude of harm he has caused, and as a result, Ganal's chances of obtaining parole will be improved. I do not believe this is the result that the Hawai'i

legislature intended by enacting HRS § 707–701(1)(a).

The majority's misapplication of merger today conflicts with the language and the legislative history of HRS § 707–701(1)(a) by allowing Ganal to escape accountability for his attempted first degree murder of Mabel Ganal, Michael Touchette and Wendy Touchette. Given the Hawai'i legislature's express intent to expand accountability for first degree murder, I do not believe that the Hawai'i legislature intended to preclude vindication for those victims who somehow manage to survive the carnage of a first degree murderer's "single intent" to kill "more than one person."

> It is more reasonable to assume the legislature intended that culpability have a relationship to the magnitude of the crime committed, including consideration of the number of victims. Otherwise, one who placed a bomb in an airline resulting in the deaths of dozens of people would be less severely punished than one who repeatedly fired a gun at a number of persons, with a similar resulting casualty figure.

State v. Mane, 783 P.2d 61, 64 (Utah Ct.App. 1989) (affirming a defendant's conviction for both first degree murder and aggravated assault, even though one victim's death and the other victim's nonfatal injury were the result of the defendant's single volitional act of firing one bullet at both victims).

All penal statutes must be accorded a limited and reasonable interpretation in order to preserve their overall purpose and to avoid absurd results. Cf. State v. Gaylord, 78 Hawai'i 127, 138, 890 P.2d 1167, 1178 (1995); State v. Taylor, 49 Haw. 624, 635, 425 P.2d 1014, 1021 (1967). The majority's interpretation of merger today fails to preserve the overall purpose of Hawai'i's first degree murder statute and produces a patently absurd result in which Ganal escapes accountability for the attempted first degree murder of Mabel Ganal, Michael Touchette and Wendy Touchette, when, in fact, these people were clearly the victims of Ganal's attempted first degree murder.

Substantial evidence in the record supports the jury's conclusion that Ganal intentionally attempted to kill Mabel Ganal, Michael Touchette and Wendy Touchette. According to the language and legislative history of HRS § 707–701(1)(a), Ganal should be held accountable for attempted first degree murder. Contrary to the majority, I would affirm Ganal's conviction for attempted first degree murder in Count II.